# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SUSAN J. GALLI, | Index No.: |
| Plaintiff, | |
| - against - | |
| PRICEWATERHOUSECOOPERS LLP; PRICEWATERHOUSECOOPERS ADVISORY SERVICES, LLC; JEFFREY LAVINE: CATHERINE STAHLMANN; MARIA CALABRESE; CHERYL RIPORTI; JOHN DOES 1-10, JANE DOES 1-10, | **SUMMONS** Plaintiff designates New York County as the place of trial pursuant to CPLR § 509 |
| Defendants. | |

To The Above-Named Defendants:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance on the plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: New York, New York
February 14, 2020

ZEICHNER  ELLMAN  &  KRAUSE LLP
Attorney for Plaintiff Susan J. Galli

BY:    _William T. Marshall, Jr._

WILLIAM T. MARSHALL, JR.
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(212) 223-0400

TO:     PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

PricewaterhouseCoopers Advisory Services, LLC
300 Madison Avenue
New York, New York 10017

Jeffrey Lavine
c/o PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

Catherine Stahlmann
c/o PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

Maria Calabrese
HR Manager
c/o PricewaterhouseCoopers LLP
300 Madison Avenue, 8th Floor
New York, New York 10017

Cheryl Riporti
c/o PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

Case 1:20-cv-01640-LGS   Document 1-1   Filed 02/25/20   Page 4 of 75

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SUSAN J. GALLI,

                              Plaintiff,

             - against -

PRICEWATERHOUSECOOPERS LLP;
PRICEWATERHOUSECOOPERS ADVISORY
SERVICES, LLC; JEFFREY LAVINE:
CATHERINE STAHLMANN; MARIA
CALABRESE; CHERYL RIPORTI; JOHN DOES
1-10, JANE DOES 1-10,

                           Defendants.

Index No.:

**COMPLAINT**

---

Plaintiff Susan J. Galli ("Plaintiff" or "Galli") by her attorneys, Zeichner

Ellman & Krause LLP, complains and alleges, upon information and belief, as follows:

### NATURE OF THE ACTION

        1.      Plaintiff brings this action to remedy, among other things,

discrimination on the basis of age and gender in violation of the New York State Human

Rights Law, Executive Law §296 et seq. (the "Executive Law"); the Administrative Code

of New York § 8-101 et seq. (the "NYCHRL"); the Age Discrimination in Employment

Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); Civil Rights Act of 1964 § 7, 42

U.S.C. 2000e, et seq. (1964) ("Title VII"); and the New York Civil Practice Laws and

Rules ("CPLR") for compensatory, special, and punitive damages resulting from sundry

common law causes of action against the above named defendants, as well as for

attorneys' fees and costs in such amounts as a jury, or this court, may deem appropriate.

        2.      A former employee of PricewaterhouseCoopers LLP ("PwC" or

"Firm") and/or PwC Advisory Services LLC ("PwC Advisory"), Plaintiff also seeks

declarative relief pursuant to CPLR § 3001 (voiding an Employment Agreement dated June 11, 2014 ("EA") and a certain arbitration agreement approved by Plaintiff on the grounds of fraud, unconscionability and a violation of public policy).

3.       The Arbitration Agreement provides in pertinent part:

"The Arbitrator shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction."

4.       Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 29, 2017, complaining of acts of discrimination alleged against certain defendants herein.

5.       The EEOC issued a for cause determination as to age discrimination and, the EEOC having been unable to resolve the dispute due to Defendants' unwillingness to participate in mediation or to offer a realistic settlement through EEOC conciliation, issued to Plaintiff a "Notice of Right to Sue" by mail on November 15, 2019.  Plaintiff has exhausted her administrative remedies.

6.       Pursuant to § 8-502(c) of the NYCHRL, Plaintiff shall cause a copy of this Complaint to be served on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

**THE PARTIES**

7.       Plaintiff Susan J. Galli is currently a citizen and resident of the State of Florida and, during the relevant time periods referenced in the Complaint, maintained a residence in the City, County and State of New York.

2

8.      Plaintiff was employed by defendants PricewaterhouseCoopers LLP ("PwC") and/or PwC Advisory as a Managing Director, a position represented to her by defendants Jeffrey Lavine ("Lavine") and Catherine Stahlmann ("Stahlmann") to be the equivalent of a non-equity partner, from August 4, 2014 through April 7, 2017 at the Firm's headquarters located at 300 Madison Avenue, New York, New York.

9.      PwC is a limited liability partnership formed under the laws of the State of Delaware and is a Certified Public Accounting firm licensed by the State of New York to engage in the accounting and related businesses, including advisory services, and which maintains its headquarters in New York, New York, as noted above.

10.      Upon information and belief, PwC is part of a network of firms worldwide under the "PwC" brand, through which it conducts interstate and international business and commerce.

11.      PwC is and was, at relevant times, considered as one of the "big four" certified public accounting firms in the United States with annual revenue, during all relevant times, in the tens of billions of U.S. Dollars.  In 2019, PwC was ranked number 5 on the Forbes List of America's Largest Private Companies with $42.4 billion in revenue and 276,000 employees.

12.      PwC Advisory is an enterprise formed by PwC in Delaware in 2014, while a DFS investigation of PwC was ongoing, and was registered to do business in New York, New York in 2015.

13.      Defendant Lavine, to whom Galli reported at PwC at relevant times, was a CPA, attorney, and a partner of PwC.

3

14. Defendant Stahlmann is a citizen of the State of Florida and was at relevant times a "principal" of PwC, the equivalent of a partner, since in or about 2014.

15. At all relevant times, defendant Cheryl Riporti ("Riporti") was an employee in PwC's Human Resources Department in PwC's New York City office.

16. At all relevant times, defendant Maria Calabrese ("Calabrese") was an employee in PwC's Human Resources Department in its New York City office.

17. John Doe Defendants 1-10 were employed by PwC and are presently unknown by Plaintiff.

18. Jane Doe Defendants 1-10 were employed by PwC and are presently unknown by Plaintiff.

## FACTS

### A. PwC's Fraudulent Inducement of Susan Galli

19. In the Spring of 2014, Plaintiff was employed in the City, County and State of New York by a global bank as a financial crimes compliance leader in banking and in the area of Anti-Money Laundering ("AML").

20. At that time, Galli was considered a banking and AML subject matter specialist, having served in the financial services industry for over 27 years.

21. Galli is a Certified Anti-Money Laundering Specialist (CAMS) and was an Advisory Board Member of the Association of Anti-Money Laundering Specialists ("ACAMS") from 2009 – 2019.

4

22.     Galli had previously worked with Stahlmann and by 2014 had developed a personal friendship and trust relationship with her spanning a period of more than a dozen years.

23.     Galli had a relationship of trust with PwC because of its standing as a CPA firm, as well as the prior business relationship, having sponsored PwC with her global bank employer for significant advisory work commencing in 2012.

24.     In or about May of 2014, Lavine, Stahlmann and Riporti began to recruit Galli aggressively, to persuade her to leave her position at the bank and become a Managing Director ("MD") of PwC.

25.     Lavine and Stahlmann described the position to Galli as the equivalent of a "non-equity partner" and represented she would become, with them, the third leader of PwC's Regulatory Advisory Service ("RAS") unit.

26.     In connection with certain defendants' recruitment efforts, Lavine and Stahlmann represented to Plaintiff that:

> a.     PwC wanted to hire her as an experienced catalyst hire to elevate its profile in the area of financial crime compliance;
>
> b.     that PwC had been neglecting its marketing and practice development initiatives in the recent past few years due to understaffing and turnover of personnel;
>
> c.     that she was being hired because of her high profile in the AML community and her extensive network of contacts; and,
>
> d.     that PwC wanted her to provide it with greater visibility at key industry conferences and raise

5

the Firm's profile and stature in financial crime compliance.

27.     During this entire process and beyond, Lavine and Stahlmann, never disclosed to Galli the material fact that the New York Department of Financial Services ("DFS") and certain federal agencies were targeting an investigation of PwC's RAS unit, the very unit for which Galli was being recruited, for its agreement to alter a report prepared by PwC on behalf of a foreign bank which had permitted money laundering, economic sanctions violations and other bank fraud to occur.

28.     Lavine and Stahlmann knew of the DFS investigation, however, Galli had no knowledge of it at the time of her recruitment.

29.     Lavine and Stahlmann knew or should have known, but also never disclosed to Galli, that it was almost a certainty that PwC was going to be severely sanctioned which would have a significant impact on the RAS practice and Galli herself.

30.     Such material information would have influenced Galli's decision whether to leave her position at the global bank since it could have material negative consequences to Plaintiff personally and professionally.

31.     Lavine knew at that time of the current status of DFS investigation and the factual circumstances of a pending settlement because he was a partner and the practice leader of the specific unit being investigated by DFS but never disclosed same to her.

32.     Lavine and Stahlmann also did not disclose this to Galli because they knew she had other employment opportunities, including staying where she was, and

knew that she would not have joined them had she been aware of PwC's misconduct and its potential impact on her personally and her career.

33.     Hence, PwC made its offer of employment to Galli under false pretenses.

34.     PwC offered Galli an attractive compensation package to lure her into leaving her secure and very senior global position with the global bank and foregoing other opportunities as well as leaving an institution where she was already fully vested in the retirement plan.

35.     PwC provided her with an Employment Agreement ("EA") with an attached Arbitration Agreement which provided that she would receive a certain amount of notice of termination subject to a severance plan, which was not attached nor ever provided to Galli before or during her employment at PwC.

36.     Defendants, including Lavine and Stahlmann, put intense pressure on Galli to join PwC as soon as possible, likely knowing that a settlement with the DFS was imminent; however, they did not reveal the true reason for wanting to hire her and that Galli would probably decide not to agree to join PwC had defendants disclosed such information.

37.     PwC knew at the time that it was about to enter into a very unfavorable settlement that would not only impact its reputation, but impair its ability to conduct business with an entire set of key clients or client prospects. This was never shared with Galli, in particular the fact that the Firm planned to make her personally a party to the agreement.

38.     Having noticed at the time of her recruitment that PwC had a separate AML unit which was part of its Risk Assurance line of service, Galli specifically asked Lavine, the PwC partner in the AML RAS unit for which she was being recruited, whether the other unit (technology unit) would pose any internal competition to her and the advisory practice.

39.     Lavine represented and assured Plaintiff that it would not be the case because, he told her, the technology practice area of PwC did not have her subject matter knowledge or the experience to handle the advisory work done by the RAS AML Advisory practice.

40.     Lavine and Stahlmann knew, or should have known that shortly before they began to recruit her, that while the investigation was ongoing, PwC had formed PwC Advisory, which PwC expected would have a profound effect on the RAS unit she was being asked to co-lead, also a material fact which defendants had not disclosed to her.

41.     Clearly, had she known of PwC's regulatory problem, she most certainly would not have signed the EA and most assuredly she would have hired a lawyer before agreeing to sign such a contract considering the materiality of the facts which defendants failed to disclose to her.

42.     Plaintiff wanted to defer joining the PwC until in or after November 2014, because of a vacation she had planned, coincidentally with her friend Stahlmann, in November 2014.

8

43.     PwC, however, insisted that she join as soon as possible because it represented it had a need for a third leader in the AML advisory department and because PwC had neglected its duties and needed to achieve a market share of the burgeoning business.  None of the above representations were true, but in reliance on them and not having been informed about the material facts noted above, Galli decided to approve the EA and Arbitration Agreement on June 11, 2014 which was the only written documentation that she had received to formalize the verbal offer of employment that she had received in May 2014.

44.     On August 4, 2014, Plaintiff joined PwC as an MD, allegedly as one of three leaders in PwC's AML Advisory unit.  But that also proved not to be true.

45.     Such falsehoods and deception were part of a larger fraudulent scheme which had developed over the years at the "Big 4" firm.

**B.      PwC's Corrupt Business Model and Its Fraudulent Deception of the
New York State Banking Department and Federal Regulatory Authorities**

46.     In or about or before 2008, PwC had made a calculated decision to jeopardize its business reputation by acceding to the demands of a banking client to redraft the report by amending the wording in material ways that omitted or downplayed issues of material regulatory concern, thus misleading both the U.S. and New York State regulators.

47.     These regulators had been investigating one of PwC's foreign-based banking clients for possible violations of U.S. and New York banking laws and Anti-Money Laundering and Office of Foreign Assets Control ("OFAC") sanctions laws, rules, and regulations.

9

48.     The investigation involved actions by the subject bank having unlawfully cleared about 28,000 transactions worth about $100 Billion between 2002 and 2007 and involving foreign entities suspected of Money-Laundering, sanctions evasion and other crimes.

49.     The violations carried out by the bank are considered a threat to the U.S. Banking system and to the national security of the United States of America, and PwC aided and abetted the client to obscure these facts.

50.     Professing itself to be a firm of experience and integrity, PwC knew or should have known that such reckless behavior lacked the objectivity and autonomy expected of a big four accounting firm and violated the Firm's own Code of Conduct.

51.     On orders by the regulators, the subject bank chose and hired PwC to analyze the suspicious transactions and to develop an Historical Transactions Report (HTR) for the subject bank to present to the regulators to assess the severity of the suspected violations by the bank.

52.     The banking regulators apparently approved and agreed to accept and rely on the findings of PwC in the HTR, based on PwC's status as a Certified Public Accounting firm which could be trusted and relied on for accuracy.

53.     PwC personnel were present at one or more of the presentations made to the regulators by the subject bank.

54.     At some point, PwC apparently learned or discovered that the regulatory investigation into the transactions that were the subject of the HTR was more

serious than they had anticipated. PwC also learned that the client had deliberately altered or omitted information from wire payments to conceal transactions with U.S.-sanctioned nations, including Iran. This issue had not been addressed by the methodology PwC employed for its review, and a more complete "forensic review" was warranted and should have been recommended to the client.

55.     The subject bank requested that PwC make material changes to the HTR, because the failure to do so could affect the outcome of the regulators' decision as to the magnitude of the fines or sanctions might be appropriate for the bank.

56.     Regrettably, motivated by profit and greed, and in order to curry favor with its client, PwC acceded to the request of the bank and knowingly altered the wording and which ultimately misled regulators as to the severity of the bank's misconduct.

57.     PwC also disregarded its obligation to maintain its independence as a Certified Public Accounting firm and that the regulators, by adopting PwC's findings, indirectly had become "clients" of PwC for purposes of its assessment in the HTR.

58.     Conversely, PwC had a legal and fiduciary obligation to disclose and present the true facts to the regulators, but it freely chose not to do so. Rather than educating the client about the risks associated with lying to a regulator, PwC succumbed to greed and placed revenue interests above ethical considerations.

59.     In reliance on PwC's erroneous HTR, DFS eventually fined the bank in the amount of $250,000,000 in June 2013 for its role in clearing the transactions involving sanctioned entities.

11

60.     In 2013, DFS commenced a subsequent investigation into PwC's suspected role in a cover-up as a result of a falsified HTR.

61.     In the Spring of 2014 while the investigation of PwC was underway, it formed PwC Advisory, a firm to be used as an alternate means for PwC to conduct its advisory services.

62.     PwC apparently never disclosed to DFS that it had formed PwC Advisory to perform its financial services industry advisory services, a material fact which should have been disclosed – another cover-up or lie by omission.

63.     The investigation continued, negotiations ensued, and the matter was settled by an agreement between PwC and the DFS in August 2014.

64.     As a result, the bank was fined an additional $315,000,000 in November 2014, showing the significance, in terms of dollars, of the effect of PwC's falsified HTR. This brought the total fine paid by the bank to $565,000,000.

65.     PwC itself was fined in the amount of $25,000,000, apparently the largest fine ever levied against a financial services advisory firm, for its role in the cover-up of evidence.

66.     In reality, however, this was a minimal portion of PwC's income for 2014, which, upon information and belief, was approximately $34 billion and made PwC the sixth largest private company in America according to the Forbes' list, PwC bought its way out of existential trouble for a song.

67.     But rather than reform PwC, it spawned other frauds and deceptions, such as that experienced by Galli.

12

C.    **Defendants Institutional/Deceptive Business Practices**

68.    Unbeknownst to Galli was the fact that the agreements (i.e., the EA and Arbitration Agreement) she was induced to approve were an integral part of a broader corrupt, fraudulent and deceptive business practice which began as far back as the 2008 scandal and which continued throughout her employment at PwC.

69.    The above agreements were part of a toolbox of fraudulent tactics and weapons PwC employed to enable it to act with impunity in the conduct of its business and in its relationship with its employees, without any accountability. These agreements were designed to protect the Firm rather than the employee.

70.    The EA, the Arbitration Agreement and even the severance plan (alluded to in the EA), were  replete with traps and devices, seemingly lawful on their face, but used by PwC for an improper and unlawful purpose – as a sword rather than as a shield,  to act with impunity towards its employees, especially Galli, and in disregard of its obligations as a CPA firm and relevant laws and regulations.

71.    PwC was maintaining a corrupt business model which Galli never expected to confront from a renowned, respected and supposedly trustworthy CPA firm such as PwC.

72.    The agreements were not only part of a carefully orchestrated fraudulent, deceptive and corrupt business practice, but contained provisions which are substantively unconscionable and contrary to public policy, namely being anti-competitive and in disregarding basic human rights.  They were designed to reduce an "at will" employee to the equivalent of an indentured servant, not free to leave the

13

employment of PwC and make a living in a business which might compete with PwC. It was a way for PwC to commit wrongful and unlawful actions with impurity, as it did against Galli.

73.     The EA contained a myriad of clauses of restraints upon Galli if she were to leave PwC's employment; an overly broad confidentiality provision; a broadly worded restrictive covenant which _effectively_ prohibited her from working for two years with a competitive firm; and incorporated an Arbitration Agreement in which she waived her right to go to a court of law, have a jury trial, or be part of a class or collective action. These provided PwC with a means to force a wronged employee who is terminated without cause to have to provide a release in order to receive severance benefits and hinders that person's ability to work as a consultant because of overly broad non-compete and non-solicitation clauses.

74.     The EA was to provide Galli with three months' notice of termination but made it subject to a purported ERISA Severance Plan for which she was never provided with even a Summary Plan Description ("SPD"), as required by federal law and/or regulations.

75.     The Severance Plan itself is a sham, because it provides the broadest discretion imaginable to PwC to make a determination and to appoint the "fiduciaries" to the Plan, and which requires an "exhaustion of administrative remedies" before a qualified employee can seek intervention by a court of law under the ERISA and Labor law. This together with the EA and AA is part of a process designed to drag out legal proceedings and rack up costs to the employee instead of creating simplicity and fairness and, frankly, permits PwC to wear down employees, who may not have huge

financial resources and who can and are stonewalled by PwC in their attempts to collect their benefits.

76.     The referenced "fiduciaries" for the Plan are employees on PwC's payroll and subject to the supervision of PwC because they are part of the same business units as the defendants in this matter, confirming their partiality creating a conflict of interest as a matter of law. The "fiduciaries," who make the decisions on Plan disputes and field requests for information and documents, also employ the same attorneys as PwC, which creates a rigged system of justice.

77.     These are a few of several insidious devices, artifices and weapons PwC has in its toolbox and PwC has, in fact, used them on Galli. This gives the Firm power and leverage to extort a general release from employees who have bona fide claims, particularly those based on alleged violations of the employment and labor laws.

78.     This scheme creates a costly, rigged procedure geared to discourage even the most passionate employee from seeking protection of basic rights under contract or under the federal, state, and local laws.

79.     In the case at bar, Galli was forced to file a claim under the Plan because she would not adhere to PwC's demands and sign a general release in favor of PwC, in exchange for what she believed she was owed under the Plan.

**D.     Galli's On-Boarding at PwC, Discovery and Fiscal Year 2015**
     **PwC's FY2015 (July 1, 2014- June 30, 2015)**

80.     Plaintiff was "on-boarded" at PwC but her first day on the job in the New York office after her initial two-week orientation was Monday, August 14, 2014.

15

81. Plaintiff learned of the DFS investigation and the Settlement Agreement not through PwC, but through the media on or about August 18, 2014, when the information became effective and public.

82. Concerned about this material development, Plaintiff approached Lavine and requested she be transferred to another practice area of the Firm, but Lavine summarily refused her request. Lavine admitted and represented to Galli that the Firm might look bad in the eyes of the DFS and might question her transfer, if he were to do so even though Galli had nothing to do with the matter that led to the investigation and Settlement Agreement which occurred at least six years before she joined the Firm.

83. These statements by Lavine were false at the time, as the DFS settlement agreement itself did not pose an impediment to prevent PwC from moving Plaintiff to another unit, particularly since Plaintiff was a new employee with no nexus to PwC's sanctioned conduct and PwC was in control of providing the names of the relevant employees to be the subject of the sanctions. The Agreement, that was published in August 2014, also allowed for regular dialogue between PwC and the DFS.

84. The settlement agreement prohibited PwC's RAS unit, the unit Galli has been hired to help lead, from acting as independent consultants for DFS regulated banks and to have access to Confidential Supervisory Information ("CSI") for DFS-regulated clients for all new engagements.

85. In light of the foregoing restrictions due to the DFS settlement, and the provisions in her EA, Plaintiff was essentially trapped at PwC and would be greatly hindered in her ability to personally provide services to DFS-regulated clients. The fact that PwC was publicly sanctioned also put the Firm itself, at a distinct competitive

16

disadvantage vis-à-vis its competition, and the Firm lost multiple proposals for DFS-regulated banks during the two-year ban.

86.     Galli requested that her name be removed.  Lavine summarily refused.  His statement that he could not discuss my situation with the DFS was also false because there was a provision in the settlement agreement providing for regular dialogue between PwC and DFS.

87.     Galli requested that her name be removed.  Lavine summarily refused.  This was also false because there was a provision in the settlement agreement providing for regular dialogue between PwC and DFS.

88.     Lavine assured Plaintiff and other employees of the AML Advisory practice RAS unit that they should not be concerned about the sanctions because it was only a two-year ban and that it did not pertain to projects in place at the time of the ban.  Lavine represented to the team that there were enough projects at PwC which were exempt from the ban to carry the unit (and, therefore, the team) through its expiration in August 2016.

89.     Based on those representations and assurances, Galli continued in her job and proceeded to carry out her responsibilities to the best of her ability.  But Lavine's representations proved to be false.  As the head of the unit, he knew or should have known the truth.  Lavine's assurances and guarantees were not honored.

90.     Despite this Galli persevered in her service to the Firm and it is well documented that Plaintiff had a banner Fiscal Year (FY)2015.  She was thoroughly evaluated and rated a "high performer" and was pegged as a "leadership champion" for

17

PwC's talent transformation process it had rolled out in 2015. Plaintiff received her promised 2015 bonus in the amount of $100,000, but PwC reneged on Plaintiff's eligibility for a merit increase, contrary to her EA and performance rating.

91.     The environment at PwC abruptly changed. In or about July 2015, several things happened which fomented a culture of discrimination at PwC.

**E.     Effects of Sanctions on PwC**

92.     In negotiating the Settlement with the DFS, PwC had agreed to curtail the ability of RAS practice employees from working on new DFS projects. PwC did not reveal to DFS that there were other PwC practice units that also carried out AML advisory work for DFS-regulated banks. In an attempt to mitigate the impact of the Settlement Agreement, it formed a new legal entity, PwC Advisory, to consolidate its advisory business, by which it allowed PwC to largely avoid the sanctions.

93.     In the Spring of 2015, about nine (9) months into its two-year ban imposed by DFS, PwC registered PwC Advisory as a company doing business in New York and later transferred all of PwC's U.S. Advisory personnel into this entity without prior notice or explanation.

94.     DFS did not release PwC from the sanctions until August 2016, but did not confirm this to PwC until October 2016. Galli was never informed that the sanctions were formally over.

18

**F.  PwC's Metamorphic Conversion FY2016 and the Dawn of Discriminatory Conduct Against Galli**

95.     Things abruptly changed for Plaintiff and other employees at PwC in the beginning of the FY2016 performance year.  PwC adopted and acted out a culture not only adverse to the law, but to its own code of conduct and those required by the standards of the accounting profession.

96.     PwC's employees were eventually told that they had been moved into the new legal vehicle, PwC Advisory, but were never asked to re-execute employment agreements with the new employer entity.

97.     PwC had also formed a new business unit called the Financial Crimes Unit ("FCU") which brought together several disparate practice areas, each of which was performing various aspects of Financial Crime advisory work for PwC on behalf of clients, mostly banks, some of which were under the supervision of the NY DFS.  DFS apparently was not aware that other practice units at PwC besides the sanctioned RAS unit conducted financial crimes compliance work.

98.     As part of this consolidation, the FCU created an internal "joint venture" between the employees, principals and partners in the ARCA technology unit, whom were not bound by the letter of the DFS sanctions, and the other advisory employees in the FCU, some of whom were also not subject to the sanctions.

99.     The unit subject to the DFS Settlement Agreement was essentially dissolved, without the knowledge or consent of DFS.  Communication with the DFS has confirmed that it was apparently not aware of this development.

19

100.     This "joint venture" brought more employees, partners and MDs, many of whom were clearly younger than Galli, into the FCU and working on AML engagements, and internally it created an unlevel playing field for project work since only the former RAS unit employees were constrained from working with DFS-regulated clients.

**G.     Other Devices**

101.     During FY2016 Galli was increasingly tasked by Mr. Lavine with initiatives, that while beneficial to the Firm and furthering the performance goals of the PwC Professional Framework and employee development, did little to contribute or relate to her "utilization" or revenue goals.

102.     Examples of such initiatives were his request for Galli to be the champion for the roll out of the PwC Professional Framework including serving as a relationship partner for 12 Senior Associates in 2015 and 24 in 2016, serving as the Diversity Partner (even though she was only an MD) for the 2016 Career Roundtable, and coordinating marketing events for RAS both at conferences and in-house, as well as coordinating training for RAS employees.  She was also frequently asked to review project deliverables for projects that she was not formally assigned to, and thus did not receive sales or utilization credit for them.

103.     She was also assigned by Lavine to work with the Global Financial Crime leader in the UK to represent PwC US at those meetings, and to help develop a business plan and strategy for global PwC clients for financial crime work.

20

104.     While these activities contributed to the success of the practice, they did not contribute at all to Galli's personal sales or utilization goals, but took up a great deal of her time. It appears that Galli's FY16 evaluation was based solely on revenue metrics and no consideration was given to any of the other work she did at Lavine's direction.

105.     Over time, and as the number of these administrative projects increased, Galli also began to notice that her authority was becoming limited and she was being cut out of certain partner meetings and excluded from prime client opportunities which were being diverted to younger male Directors and partners from the other financial crime practice units that had become part of the FCU.

106.     For example, as stated previously, Galli had specifically been tasked to represent PwC U.S. at the meetings of global PwC firms to devise and build a global business plan.

107.     However, when the FCU was formed, the new younger male head of the FCU took over as the liaison with the global PwC firms, and Plaintiff was excluded from them even though she continued to be "invited." That is, the FCU head indicated that he would attend, if anyone from the US attended, and essentially made it clear that nobody else from the US should travel to participate.

108.     And while Galli worked with the Global AML Partner lead on the sales strategy and business plan for AML, she was ultimately not named as a lead client liaison for any of the top target clients since those roles were assigned to younger male partners with less experience and industry knowledge.

21

109. Plaintiff was, on several occasions, told by PwC's risk partners that she could not work on specific projects due to the two-year ban, and Lavine insisted on putting her on certain projects as an "investment" to win other work from a potential client, which typically meant she would not earn any credit for utilization or revenue.

110. Lavine repeatedly assured her that this would not negatively impact her evaluation, and Galli relied on these representations. Contrary to Lavine's representation, this was false and it was held against her, without her knowledge at the CRT when he did not advocate for her.

111. Plaintiff was also removed from other jobs on which she had done work, in favor of placing other younger male partners on them.

112. In addition, she was often instructed not to bill her time on certain projects.

113. In February 2016, it was announced that the AML Regulatory Practice was bringing in a direct-admit partner from another accounting firm, a significantly younger male estimated to be in his forties.

114. This increased the number of partners in the RAS to three, and he eventually wound up replacing Galli. Initially, Lavine represented to her that the new partner would be bringing over his own portfolio of clients, focusing on "gaming and casino" clients, but when the number of projects coming from the gaming clients was relatively small in number, that partner was encouraged to, and began working and encroaching on Galli's existing banking contacts that she and the existing two partners already had or had been working to cultivate.

22

115. The new partner was also clearly being given priority as an engagement partner on new engagements, and rather than assigning any of these engagements to Galli, the new partner was assigned to multiple engagements at the same time, even though Galli had an equally strong relationship with the clients and had more relevant banking experience for the projects being undertaken than this new partner or other new partners from the technology unit that were also encroaching on advisory work.

116. Galli was given no role in, or credit for, bringing in one of the projects even though she had initiated contact with the client who was a former banking colleague of hers, and on the other project, she was removed from the project after three months and the three younger male partners remained on it, even though she was the one that had the relevant banking and product experience for the project. She was tapped to provide subject matter expertise even after being removed from the project, but she was not able to bill her time or earn revenue credit for the project.

117. When she was recruited, Galli was told that as an MD she was like a non-equity partner. However, she later learned she could never be promoted to partner, as PwC enforces a mandatory retirement age of 60 for its partners, which in and of itself, is illegal under the ADEA.

118. In practice, younger, less experienced directors and MDs, were being promoted to the partner/principal level, and while an MD had the same level of responsibility as a partner, had a higher hourly billing rate than did younger, less experienced partners, the level of authority that an MD actually had was much less, since an MD is considered an employee and not an owner of the Firm, and does not receive any

23

of the benefits upon leaving the Firm that partners do, such as a guaranteed pension and paid health benefits.

119.    Since Galli joined the Firm when she was 59 and a half, she clearly was denied any opportunity for advancement or future promotion since she was almost at the age milestone that the Firm had chosen for partners to retire, and the only position more senior to MD is partner or principal.

120.    In May 2016, just prior to her annual review, Lavine asked her what her future plans were, suggesting that she might like to retire.  Plaintiff, however, pushed back and told Lavine she had no intention of taking an early retirement.

121.    Her response was that she had given no thought to leaving the Firm as she had only recently joined and was very happy at the Firm other than the fact that she felt that she was being under-utilized.

122.    Parenthetically, that was a few months before her 61st birthday and she believes Lavine knew, or may have known her age, more or less, from her years of experience and because she had to provide her birthdate during the onboarding process.

123.    Again, Galli knew that PwC partners have to sign contracts obliging them to retire at 60, however, there was no language about a mandatory retirement age in her MD Employment Agreement and she wasn't about to engage in such a discussion.  Mr. Lavine also did not offer any incentives for Galli to retire.

124.    The results of Galli's annual evaluation for FY2016 were deferred and not communicated to her until the end of July 2016, the beginning of Fiscal Year 2017, and not signed until August 26, 2016.

24

125.   For her FY2016 annual review she was downgraded, without justification, from a high-performer to a "needs improvement."

126.   The effect of this rating was to disqualify her from any bonus or salary increase.  The prime reason for the rating was a failure to attain the desired sales and utilization goals.  No consideration was given to the fact that Galli had been under the DFS settlement constraints for the two years, essentially during the entire time she had been employed by the firm or that she was repeatedly assigned to projects that did not contribute to sales or utilization by Lavine. This also contradicted the representation made to her by Lavine when he hired her that she would not be held to a sales, or "eat what you kill" standard. And that sales were evaluated on a team basis**.**

127.   Further, in her May 2016 meeting with Lavine, at no time did he tell Galli or document any serious performance issue that was going to lead to an unfavorable performance rating.  Galli had been rated as a High Performer the prior year, and, therefore, if Lavine was intending to rate her as "Needs Improvement", there should have been discussion and documentation to that effect prior to the Career Roundtable ("CRT") (annual review) and a conversation with Human Resources.  None of that occurred.

128.   During the May 2016 performance review that was held for employees who were directors and below, Galli participated as the designated diversity partner, and it was announced that there would be a mandatory cut of a pre-determined number of employees since this had been mandated across the Advisory line of business.

129.   Each practice unit was required to "force rank" employees, as part of a plan to have a certain number of "needs improvement" employees (the implication

25

of this rating is that the employee is then not eligible for a discretionary bonus and any that fall in the lowest rating category would be immediately terminated as part of the CRT).

130. This is an unfair subjective evaluation which forces the creation of false statements and records and essentially allows partners to engage in a popularity contest to reward their favorite employees.

131. This same procedure applied at the performance review for MDs and partners, where Galli was rated as "Needs Improvement" apparently based solely on her 2016 annual utilization of 15%, resulting from the above discriminatory actions against her which reduced her billable work time (i.e., utilization) or gave her no credit for work actually performed or that she helped to win but for which Galli was specifically told not to bill based on instructions from a Partner, usually Lavine or Stahlmann. Had she received credit for that work, and had she not been prohibited from working on certain DFS engagement, she would have achieved those targets.

132. The exclusive focus on Galli's sales activity and utilization was also inconsistent with the PwC Career Progression Framework launched in September 2014. This performance management system was intended to evaluate each employee's performance based on five performance attributes, not just sales and utilization. The partners have completely ignored this and focused solely on sales and utilization.

133. Furthermore, the performance snapshots that Galli obtained during the performance year did not indicate any performance attributes that required development actions. In fact, she was rated "at level" or "at next level" for all five performance attributes in all of her performance snapshots.

134.    It is also important to note that Galli was at no time placed under any written Performance Management Plan nor were there ever any conversations with Human Resources about any performance development needs.

135.    Based on the representations and assurances by Lavine to Galli, while utilization and sales numbers were automatically calculated, these metrics should not have been applied as a material factor, and apparently the sole factors, in the 2016 Annual Review.

136.    And while the results of the annual CRT performance evaluations were supposed to be communicated to staff no later than July 1, 2016 but preferably by mid-June, in Galli's case, the results of her 2016 rating were not communicated to her until the end of July 2016.  The Report itself was not signed formally until August 26, 2016.

137.    All year long Galli had been assured that she and others would not be penalized for the utilization issues described above, particularly as they related to the DFS restrictions, but Mr. Lavine clearly did not effectively address the reason for Galli's low utilization being beyond her control, or articulate all of the other things that Galli had accomplished throughout the year, and allowed her to be rated as "Needs Improvement as part of the forced ranking."

138.    This meant that not only did she not receive any increase, but she also did not get any discretionary bonus.

139.    As it turns out, this performance rating also set her up for eventual termination even though at no time did Lavine ever indicate that this was a possibility.

He had simply urged her to initiate more monthly client meetings and to invite along a colleague from the technology unit on these client calls.

140.   Galli fully expected to be able to finish out the performance year and was making every effort to focus on client pursuits and increasing her utilization, and she was inviting one of the technology partners to participate in these efforts.

141.   The subject review was skewed and contrived and not supported by the comments made by her evaluators throughout the performance year.   It was palpable that this was the result of her remarks in May 2016 meeting with Lavine that she was not ready to retire and that she was going nowhere voluntarily.  Lavine did comment to her in the July 2016 meeting that "he was sorry he had to make this about performance."

142.   As it happened, Galli was several years shy of being eligible for Medicare benefits and less than a year from vesting on her ERISA-based retirement and PwC wealth-builder accounts.  However, by terminating Galli when it did, PwC caused Galli to lose 60% of her retirement benefits that were not fully vested, something she could ill afford at this stage of her career.

143.   Plaintiff's rating apparently was based solely on utilization and revenue generation metrics, and did not, as was required by PwC's performance evaluation system, take into consideration any of the performance snapshots that Plaintiff had earned throughout the year.

144.   This was contrary to the representations that Lavine made when she was hired and the subsequent representation he made when the DFS two-year ban was announced.

28

FILED: NEW YORK COUNTY CLERK 02/14/2020 05:38 PM
NYSCEF DOC. NO.    Case 1:20-cv-01640-LGS   Document 1-1   Filed 02/25/20   Page 32 of 75

INDEX NO. 151720/2020
RECEIVED NYSCEF: 02/18/2020

145.    That is, Lavine had indicated to all employees in a public call, to prevent defections, that the restrictions on RAS employees would not personally negatively impact them, but this was clearly not true which Lavine knew or should have known since not only were RAS employees personally banned from performing this work, but several key project proposals were lost to competitor firms because of the DFS issue.

H.    **Fiscal Year 2017: Upward Surge for Galli But Termination**

146.    As part of her post-CRT discussion with Lavine, she was told that she should be having 5-6 client meetings per month, and that she should be taking other members of the AML team, particularly technology teammates, to client meetings. These happened to be all younger males, and in retrospect, the intention was to ensure that they were introduced to Galli's extensive network of contacts.

147.    At no time during the post-CRT meeting did Lavine indicate that Galli was in any jeopardy of losing her job. In fact, during the Fall, Galli had to search for a new apartment in New York City and organize a move for January when the lease on her existing apartment was up, and neither Lavine not Stahlmann advised her not to renew her lease. In fact, Calabrese of Human Resources provided Galli with a letter confirming her PwC income so that she would qualify for Board approval of the lease. As it turned out, Galli was terminated just two weeks after the new lease started in January 2017.

148.    This recommendation also posed a logistical challenge, a pretext to set Plaintiff up for failure, because at that time she was assigned to an engagement requiring her to be in Washington, D.C. 3-4 days per week, whereas the Firm did not have

29

many financial institution clients in the D.C. area, save the one she was already working with at the time.

149.    Nevertheless, Plaintiff organized as many meetings as she could, and where feasible, invited technology colleagues to participate but it was generally not reciprocal.

150.    It became patently clear that she was inviting people to her meetings, but generally, with the exception of one male Partner, she was being isolated from sales opportunities.

151.    In addition, there was little reciprocity in including Plaintiff, an older female, to their sales and client meetings or, very often, the meetings were scheduled when she was unable to attend because she was working at a client site in another city.

152.    It started to become clear, however, that while she was including technology partners in her meetings and introducing them to her contacts, generally, with the exception of one male Partner, she was being treated differently.

153.    There was little reciprocity of including her, an older female, in their sales and client meetings; or the meetings were scheduled when she was not available due to other commitments.

154.    Galli also traveled to Europe twice during the Fall of 2016 to meet with senior client contacts that she had with a major German bank, and also collaborated with her colleagues in PwC Milan on an opportunity with an Italian bank.

30

155.     While it is true that one of the banks approached Galli about a full-time position, this ultimately did not come to fruition since Galli's contact abruptly left his position due to his perceived lack of support for additional resources.  Galli had independently come to the same conclusion that the bank did not have the necessary resources, and would not have accepted a role there had it been offered.  Lavine and Stahlmann have since claimed that they coached Galli to take this role, which is completely untrue.

156.     By August 2016, two months into FY2017, Galli's utilization had been approaching 38% on her existing project, when she was abruptly removed from the sole project on which she had been working.

157.     She had been instructed <u>not</u> to bill her time on the project, as the client was complaining about the project cost.  Since not submitting her time had negatively impacted her evaluation in the prior CRT, and was contrary to Firm policy, Galli submitted all of her billable time, and told the partners it was within their discretion whether or not to bill the client for some or all of her and their time.

158.     Had Galli not billed her time, as the partners were instructing, her utilization would have been 0%.  Pursuant to PwC's Employment Practices Policies and Procedures, revised 11 May 2016, Section 3.3 states:

> **"Maintaining a discrimination and harassment-free work environment:** It is against the law and firm policy for any firm personnel, including partners, supervisors, managers and coworkers, as well as clients and other third parties, to discriminate against or harass any other firm personnel based on any of the protected characteristics listed in section 3.1 or any other status protected by law. Harassing behavior may involve causing discriminatory intimidation, ridicule, insult that has the purpose or effect of unreasonably interfering with an individual's work

31

performance or creating an intimidating, hostile, or offensive work environment, as viewed from the perspective of a reasonable person."

159.    By excluding Galli from meetings with the client and including junior partners without the requisite regulatory and product experience solely so they could rack up their own utilization and sales numbers, and by attempting to pressure Ms. Galli to violate Firm policy and not bill her hours, this constituted harassment and created a hostile work environment. When Ms. Galli did not comply with their request, and submitted her time, the partners retaliated against her and removed her from the project.

160.    Galli did not think at the time that it was prudent to file a complaint with Human Resources, as that essentially would have made the hostile work environment even more toxic and possibly would have eliminated any chance of having a productive working relationship with any of the partners.

161.    Even by the time PwC had apparently determined to terminate Galli, she was never given formal notice of her termination.

162.    On January 26, 2017, Lavine called Galli to his office and had a brief conversation with her. He told her that "he could no longer defend her," and that the Firm was making a list of individuals to lay off (although there were still six months left in the performance year).  The firm was quietly terminating a few employees each month rather than one big layoff that undoubtedly would have required formal reporting.

163.    At no time during that conversation did he tell her that she was being given notice as of that day, nor that her last day was to be April 7, 2017.  There was no written documentation associated with this meeting nor was Human Resources ("HR")

present, which was protocol, if it were to be a meeting to formally give Galli notice of her termination.

164.     Instead he told Galli he would have a meeting with her and a person from HR on February 1, 2017, but the meeting never took place as Lavine was not present in the New York office that day.

165.     Lavine was out of the office, apparently on a business trip, and never rescheduled any such meeting. Galli did not see or hear from Lavine again until April 4, 2017, when she was attending an industry conference that he also attended.

166.     On March 7, 2017, Galli spoke briefly with Stahlmann, at a conference in Florida.

167.     Stahlmann, who had been with her in Germany the prior week or so, asked her how she was doing and inquired whether she had been in contact with Lavine. Galli replied that she had not heard from him since the January 26 meeting.

168.     Within hours of her having spoken to Stahlmann, Galli received a strange email from her with no subject or message and only an attachment that was a copy of what looked like a draft letter unsigned and bearing the date February 27, 2017, which referred to an April 7 termination date. That draft, or a final version of same, was never sent to or received by Plaintiff from the author, nor did the author sign it.

169.     The draft apparently had been composed by Calabrese in Human Resources and, on its face, was not factually accurate because Calabrese was not at the January 26, 2017 meeting, and had not met with Galli and Lavine on the scheduled February 1, 2017 meeting which did not occur, or at any other time.

33

170.    The letter incorrectly stated that the terms outlined in the letter had been discussed when Galli met with Lavine on January 26th, which was not the case. In fact, none of those details were ever discussed with Lavine, even when Galli met with him on April 4th.

171.    Galli never received or saw the final version of that letter, only the draft when she received it from Stahlmann's iPhone.

172.    Calabrese never sent Plaintiff a final version of the letter.

173.    The next time Plaintiff saw or heard from Lavine was on April 4, 2017 (three days before her actual termination) while they were both attending an industry conference. Galli was attending the conference as an ACAMS Advisory Board member and speaker.

174.    During her discussions with Lavine on that date, he never discussed or even raised a Notice Period (for severance pay purposes) or, for that matter, her Termination Date, although he did mention to her that if she were to decide to go out into business on her own, she would be free to do so, because the Firm would not seek to enforce the restrictive covenants in her EA, whereas PwC would not like or be receptive to her working for another competitor firm.

175.    The assurances provided by Lavine were also not consistent with the Separation Letter received the following week, purportedly from Mr. Lavine. He also never responded to several emails that Galli sent to him trying to identify specifically which clients PwC felt were covered by the restrictive non-solicitation clause.

34

176. PwC terminated her from employment on April 7, 2017. Shortly thereafter, PwC gave instructions to its vendor to cancel Galli's Health Care Spending Account, which should have remained available to her until the end of April 2017, and they reversed several payments that had been made to American Express for authorized charges on Galli's corporate Amex card which caused Galli's account to become delinquent. Galli had to spend many hours working with a substitute admin to resolve the American Express issue, and the Health Care Spending account money was never made available to Galli for her authorized expenses. During all of this Lavine and Stahlmann were absolutely not helpful, and ignored Galli's requests for assistance for the most part.

177. Following her termination, Plaintiff received in the mail an unsigned letter dated April 7, 2017 confirming her termination and containing within it a proposed Agreement and General Release ("A & R") in favor of PwC, its subsidiaries, partners, principal, and employees ("Termination Letter").

178. Galli sought advice of legal counsel, which the Termination Letter suggested she do before signing, and she ultimately refused to sign the proposed A & R in the Termination Letter on the grounds it lacked adequate consideration because she had numerous statutory and common law claims for damages against PwC, including some of its partners and/or principals; and because the A & R did not adequately provide her with the severance to which she was entitled under the PwC Severance Plan and attempted to place conditions on the severance payment.

35

179.    Although the Termination Letter made no mention of the PwC Severance Plan, it was transparent to Plaintiff that PwC was using the payment of benefits under the Plan as leverage, or a wedge, to obtain a full release from all possible wrongdoings, such as fraudulent inducement; intentional infliction of emotional distress; intentional interference with business opportunity through attempting to enforce a two-year non-solicitation by Galli of PwC's clients and employees and by defamation; and discrimination based on age and gender.

180.    Payment of the full amount of severance referenced in the letter was contingent on signing the A & R.

181.    It was also apparent that, in an effort, to try to intimidate her for refusing to sign the A & R, PwC was "slow walking" payment of her final authorized travel and entertainment expenses which caused her corporate credit card account to become delinquent, as well as not providing her with requested information about the PwC Notice/Severance Plan.

182.    Galli had never been provided with a copy of the Plan, or even its Summary Plan Description, during the entire time she was employed by PwC, although the Policy had been mentioned in an Employment Agreement she was required to sign on June 11, 2014 before joining the firm.  She had asked Human Resources for a copy several times after her departure and was told that the Severance Plan was included in her employment letter.

183.    After much haggling with PwC, it refused to respond to Plaintiff except through its local counsel. Thus, Plaintiff hired counsel and obtained a copy of the Plan only after her attorneys demanded a copy of same from PwC.

36

184.     After leaving the Firm, in September 2017 Galli encountered two of her former PwC partner colleagues at an industry conference and was put in the uncomfortable position of having two of the young male partners, referred to earlier, sit down and join her and several potential clients for drinks.

185.     These partners both formerly of the ARCA "technology unit", were two of the principals who were engaged on the last major engagement Galli worked on in Washington, DC.

186.     These were also two of the individuals who wanted Galli not to bill her time. During the course of the conversation, a potential client happened to mention that he was approaching his 60th birthday, and that perhaps he would like to pursue a second career in consulting.

187.     One partner proceeded to inform him that he could not do so at PwC because partners have to retire at the age of 60. When questioned about the reason, the partner admitted "it's because we need to make room for the young and hungry ones".

188.     He said this right in front of Galli, and once again it made Galli feel like the comment was made intentionally as a dig to her about her age.

189.     In addition to Galli, PwC also terminated a series of other Directors and MDs, all in the protected age group. Another MD from the Models and Analytics practice was terminated in July 2017 at the age of 63, and he was not given any apparent reason.

190.     There were also two other female Directors from the RAS practice who were terminated in February 2017, both estimated to be in their 50s, and two male

37

Directors from RAS who were terminated in July 2017 and July 2018 respectively, one in his fifties and the other 61 and a half. In the case of the Director terminated in 2018, he was originally told that he had to retire by the end of the calendar year. When he questioned Stahlmann about the reason, she indicated that partners have to retire at age 60. Clearly a Director is an employee and not a partner, but it appears that the main motivation for this decision was the employees age. When he started asking questions about the terms of his "retirement" and what kind of benefits he could expect, he was told that Friday of that week would be his last day. These happen to be the cases that Galli knows about, but she has reason to believe that there are many more.

## FIRST CAUSE OF ACTION

### For a Declaratory Judgment Under C.P.L.R. 3100
### Voiding Arbitration Under The EA and AA

#### (Against PwC and PwC Advisory)

191.    Plaintiff repeats and realleges paragraph 1 through paragraph 190 as if fully set forth herein.

192.    Plaintiff seeks a declaratory judgment pursuant to CPLR 3001.

193.    By reason of the foregoing, there exists an actual and present controversy of a justiciable nature between Plaintiff and Defendants, including PwC, regarding the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought under the Employment Agreement dated June 11, 2014 ("EA") and the Arbitration Agreement ("AA") annexed thereto.

194.    By reason of the foregoing, the EA and the AA were the result of Defendants' wrongful conduct identified herein, including fraudulent inducement, and

38

common law fraud and deceit in the factum. The EA, AA and separation plan were instrumentalities of a well-designed pattern of common law fraud which enabled PwC and PwC Advisory to commit fraud and other tortious conduct against Plaintiff and other employees, and to disregard the common rights of others to freedom from oppression and fraud. Defendants' calculated conduct caused Defendants to ignore statutory and common law with impunity. These agreements also contained provisions which were unconscionable and violative of public policy, not having been negotiated in good faith, lacking in an arms-length negotiation and heavily weighted against Galli and others for an improper purpose, to commit wrongdoings against her and stifle competition, prohibited by public policy.

195. Plaintiff asserts that because of the material misrepresentations and/or omissions by the named defendants in the Complaint (collectively, "Defendants"), the EA and AA are void and of no force or effect, and Plaintiff should not be bound to the terms of the referenced agreements.

196. Upon information and belief, Defendants dispute these allegations and contend that the EA and AA have been in full force or effect since their commencement.

197. A declaration is necessary and appropriate at this time so that the EA and AA are deemed void and unenforceable as a result of, among other things, the various wrongful conduct, fraud and misrepresentations of Defendants as identified herein.

39

198. By engaging in the conduct as described above and herein, Defendants have acted in derogation of Plaintiff's rights.

199. There is substantial evidence in the record of the numerous instances of Defendants' improper course of conduct over the more than two and half years with PwC, as noted below, for example, and not by limitation:

    a.    Defendants fraudulently induced Galli to leave her employment at a large bank and to sign the EA and AA.

    b.    During Defendants' recruitment of Galli, Defendants never disclosed to Galli the pending DFS investigation, the imminent sanctions, and how such sanctions would limit her in the new position at PwC.

    c.    PwC failed to supply Galli with the requisite plan and/or summary plan description only until well after she had been terminated.

    d.    Defendants defrauded and committed other tortious acts against Galli after she commenced working at PwC, including the following:

        (i)    Lavine lied to Galli after she joined PwC when she confronted him about not disclosing PwC's fraudulent and dishonest acts and the sanctions imposed upon it by the DFS;

        (ii)    PwC failed to disclose to her that she was on a list submitted to the DFS which barred her from working on new business and from getting CSI information which is vital to her professional work at DFS;

        (iii)    Lavine lied to her about PwC not being able to transfer her to another division;

        (iv)    PwC failed to consider her for a merit increase which defrauded her from higher income;

        (v)    PwC and Lavine lied to her about her role at PwC – she was a managing director in name only;

40

(vi)  PwC marginalized/subjugated Plaintiff for the benefit of younger males;

(vii)  PwC removed Galli from jobs in favor of younger men and did not give her credit for her work as she had been promised;

(viii)  PwC failed to disclose to her that she was being transferred to another unit which had been formed in order to circumvent certain regulatory sanctions and which was also not disclosed or discussed with DFS; and

(ix)  PwC gave her a forced ranking as an employee so as to disqualify her for any bonus and make her susceptible to dismissal for cause.

200.  As a result of Defendants' unlawful conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

201.  By reason of the foregoing, Plaintiff seeks a declaratory judgment voiding the EA and AA.

WHEREFORE, Plaintiff demands judgment on the First Cause of Action for the following relief:

a.  Declaring that the EA and AA are void and unenforceable.

b.  Such other relief which the Court may direct.

41

## SECOND CAUSE OF ACTION

### Fraud On Contract – Arising From Duties
### Separate Or Independent From Contract

### (Against All Defendants)

202.    Plaintiff repeats and realleges paragraph 1 through paragraph 201 as if fully set forth herein.

203.    Defendants' actions were intentional, malicious and outrageous, violative of the legal duties, over and above those imposed by contract, which were due to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

204.    Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will.

205.    As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Second Cause of Action for the following relief:

a.    Declaratory Relief as requested;

42

b.     Compensatory damages in the amount of Three Million Dollars ($3,000,000);

c.     Special damages as described above and as may be proven at trial;

d.     Punitive damages of Ten Million Dollars ($10,000.000) or more;

e.     Reasonable attorneys' fees; and

f.     Such other relief which the Court or a jury may provide.

## THIRD CAUSE OF ACTION
### Common Law Fraud in Factum

**(Against All Defendants)**

206.    Plaintiff repeats and realleges paragraph 1 through paragraph 205 as if fully set forth herein.

207.    Defendants' actions were intentional, malicious and outrageous, violative of the independent legal duties which were due to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

208.    Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will.

209.    As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe

43

financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Third Cause of Action for the following relief:

a.    Declaratory relief as requested;

b.    Compensatory damages in the amount of at least Three Million dollars ($3,000,000);

c.    Punitive Damages in the Amount of Ten Million Dollars ($10,000.000) or more.

d.    Attorneys' fees; and

e.    Such other relief which the Court or a jury may provide.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement

### Against All Defendants Except PwC Advisory and Calabrese

210.    Plaintiff repeats and realleges paragraph 1 through paragraph 209 as if fully set forth herein.

211.    At all relevant times, defendants Lavine, Stahlmann and Riporti were employees, agents, servants and/or officers of PwC.

212.    The aforementioned facts confirm, among other things, that Defendants made a series of material misrepresentations with knowledge of their falsity.

213.    Defendants intended to induce Plaintiff to enter into the EA and AA in reliance upon the aforementioned false representations and/or omissions.

44

214.   Plaintiff reasonably relied upon the representations of Defendants.

215.   Defendants' actions were intentional, malicious and outrageous, violative of the independent legal duties which were due to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

216.   Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will.

217.   As a result of Defendants' material omissions, fraud and misrepresentations, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Fourth Cause of Action for the following relief:

    a.    A declaration that the EA and AA as void and unenforceable, as requested;

    b.    Compensatory and consequential damages as described above and as may be proven at trial;

    c.    Punitive damages in an amount of Ten Million Dollars ($10,000,000) or more;

    d.    Attorneys' fees; and

45

e.      Such other relief that the Court or a jury may provide.

### FIFTH CAUSE OF ACTION
### Breach of Contract

**(Against PwC and PwC Advisory)**

218.    Plaintiff repeats and realleges paragraph 1 through paragraph 217 as if fully set forth herein.

219.    On June 11, 2014, Plaintiff and Defendant PwC entered into certain agreements, including the EA and AA.

220.    Should the Count find that the EA is enforceable Defendants PwC and PwC Advisory are in breach of their agreements with the Plaintiff.

221.    As a direct and proximate cause of Defendants' breach of the aforementioned agreements, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Fifth Cause of Action for the following relief:

a.      Compensatory damages;

b.      Attorneys' fees; and

c.      Such other relief which the Court or a jury may find or provide.

### SIXTH CAUSE OF ACTION
### Breach of Duties of Good Faith and Fair Dealing

### (Against PwC and PwC Advisory)

222.    Plaintiff repeats and realleges paragraph 1 through paragraph 221 as if fully set forth herein.

223.    Actions by a contracting party which undermine or frustrate the purpose of a contract or are contrary to the acts reasonably necessary to carry out the purposes of a contract constitute a breach of the covenant of good faith and fair dealing.

224.    Based upon the course of conduct of Defendants identified in the Complaint, Defendants have acted with an improper motive and have breached its respective covenants of good faith and fair dealing as a matter of contract and as a matter of law.

225.    As a direct and proximate result of the aforesaid breach, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Sixth Cause of Action for the following relief:

a.    Compensatory damages;

b.    Attorneys' fees; and

c.    Such other relief which the Court or a jury may direct.

## SEVENTH CAUSE OF ACTION
### Interference with Prospective Business Relations/Advantages

### (Against All Defendants)

226.    Plaintiff repeats and realleges paragraph 1 through paragraph 225 as if fully set forth herein.

227.    Both prior to and after joining PwC, Plaintiff had business relations as a specialist in banking and AML matters with a third parties including, without limitation, numerous financial institutions such as global and regional banks.

228.    Defendants were aware of the business relations that Plaintiff had with these third parties and Defendants intentionally interfered with them, including excluding Plaintiff from interactions with such institutions. Their tortious conduct also has inhibited Galli from foreseeable post-terminations relationships, particularly PwC's inclusion on the restrictive DFS sanctions list.

229.    Defendants used dishonest, unfair, or wrongful means to cause Plaintiff this burden through their malicious, outrageous conduct.

230.    As a result of Defendants' actions, Plaintiff suffered an injury to prospective business relationships.

231.    By reason of the foregoing, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Seventh Cause of Action for the following relief:

a.  Compensatory and or consequential damages;

b.  Punitive damages in an amount of Ten Million Dollars ($10,000,000);

c.  Attorneys' fees; and

d.  Such other relief which the Court or a jury may find or provide.

### EIGHTH CAUSE OF ACTION
### Unfair Competition

### (Against PwC and PwC Advisory)

232.  Plaintiff repeats and realleges paragraph 1 through paragraph 231 as if fully set forth herein.

233.  As set forth above, Defendants misappropriated by fraud and deceit property rights and information belonging to Plaintiff for their own commercial advantage.

234.  Defendants actions were done intentionally and maliciously to marginalize or subjugate Plaintiff and stifle competition, including the ability of Plaintiff to market and use her skills as a professional in banking and AML expertise.

235.  Such conduct to restrain commerce and competition is, in addition to unlawful fraudulent and contumacious conduct, but a violation of federal, state and local public policy.

49

236.    By reason of the foregoing conduct, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Eighth Cause of Action for the following relief:

a.    Compensatory and or consequential or special damages;

b.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

c.    Attorneys' fees; and

d.    Such other relief which the Court may or a jury may find or provide.

### NINTH CAUSE OF ACTION

### Age Discrimination Under Article 8 of New York City Administrative Code

### (Against PwC, PwC Advisory, Lavine, and Stahlmann)

237.    Plaintiff repeats and realleges paragraphs 1 through paragraph 236 as if fully set forth herein.

238.    Plaintiff is a female citizen who is over the age of 60, a protected category.

239.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

50

240.   PwC involuntarily unlawfully discriminated against in the terms and conditions of her employment, but failed to provide merit raises, falsified her annual evaluation reports, failed promote to promote her, and on April 7, 2017 terminated Plaintiff from her position at PwC, all of these because of age.

241.   At all relevant times, the PwC had, and still has, more than four employees.

242.   Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Age Discrimination under Article 8 of New York City Administrative Code, including but not limited, such acts identified under § 8-107.

243.   These practices were, and still are, part of a systemic and concerted conduct engaged in by PwC.

244.   As promulgated, such conduct was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

245.   In both purpose and effect, however, the conduct identified herein and PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of age discrimination.

246.   PwC's discriminatory activities include, but are not limited to, the following:

51

A.  Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their age, including Plaintiff;

B.  Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful by operating to deprive qualified employees, including Plaintiff, because of their age, of the same wages, working conditions, job security, raises and promotional opportunities that are available to younger employees;

C.  Establishing, implementing and maintaining practices, policies and procedures that have been and still are unlawful and discriminatory in purpose and effect in operating to demote, reassign and downgrade qualified employees, including Plaintiff, because of their age; and,

D.  Establishing, implementing and maintaining policies, procedures and practices that have been, and still are, utilizing subjective, non-job related criteria that, in purpose and effect, adversely affect the employment status of persons over a certain age, including Plaintiff.

247.  The aforementioned conduct had an impact within New York City.

248.  In particular, Defendants have established, implemented and maintained its practices, policies, and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, older employees, including Plaintiff.

249.  As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from the PwC's job ranks a substantial number of employees over the age of 60, including the Plaintiff.

250.    Defendants, including PwC, have willfully discriminated against Plaintiff, by the conduct identified herein, and thereafter, by discharging her on or about April 7, 2017, solely because of her age.

251.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Ninth Cause of Action for the following relief:

    a.    Statutory damages;

    b.    Compensatory damages;

    c.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

    d.    Attorneys' fees; and

    e.    Such other relief which the Court or a jury may find or provide.

### TENTH CAUSE OF ACTION

### Gender Discrimination Under Article 8 of New York City Administrative Code

### (Against PwC, PwC Advisory, Lavine, and Stahlmann)

252.    Plaintiff repeats and realleges paragraphs 1 through paragraph 251 as if fully set forth herein.

253.    Plaintiff is a female who was formerly employed by PwC and involuntarily terminated on April 7, 2017.

53

254.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

255.    At all relevant times, PwC had, and still has, more than four employees.

256.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Gender Discrimination under Article 8 of NYC Administrative Code.

257.    These practices were, and still are, part of a systemic and concerted course of conduct engaged in by PwC.

258.    As promulgated, such plan was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

259.    In both purpose and effect, however, PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of gender discrimination.

260.    PwC's discriminatory activities include, but are not limited to, the following:

        A.    Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their gender, including Plaintiff;

54

B.  Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful by operating to deprive qualified female employees, including Plaintiff, because of their gender, of the same wages, working conditions, job security, raises and promotional opportunities that are available to employees who are male;

C.  Establishing, implementing and maintaining practices, policies and procedures that have been and still are unlawful and discriminatory in purpose and effect in operating to demote, reassign and downgrade qualified female employees, including Plaintiff, because of their gender; and,

D.  Establishing, implementing and maintaining policies, procedures and practices that have been, and still are, utilizing subjective, non-job-related criteria that, in purpose and effect, adversely affect the employment status of female employees, including Plaintiff.

261.   In particular, Defendants have established, implemented and maintained its policies, practices and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, female employees, including Plaintiff.

262.   As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from PwC's job ranks a substantial number of female employees, especially Plaintiff.

263.   Defendants have willfully discriminated against the Plaintiff, by the conduct identified herein and thereafter, by discharging her on or about April 7, 2017, solely because of her gender.

264.   As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and

other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Tenth Cause of Action for the following relief:

a.    Statutory damages;

b.    Compensatory damages;

c.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

d.    Attorneys' fees; and

e.    Such other relief which the Court or a jury may find or provide.

## ELEVENTH CAUSE OF ACTION

### Age Discrimination Based on NYC Executive Law § 296

### (Against PwC, PwC Advisory, Lavine, and Stahlmann)

265.    Plaintiff repeats and realleges paragraph 1 through paragraph 264 as if fully set forth herein.

266.    Plaintiff is a female citizen who is over the age of 60.

267.    From 2014 to April 2017, Plaintiff lived and worked at PwC in New York City.

268.    Plaintiff was formerly employed by PwC and involuntarily terminated on April 7, 2017.

FILED: NEW YORK COUNTY CLERK 02/14/2020 05:38 PM
NYSCEF DOC. NO.  Case 1:20-cv-01640-LGS  Document 1-1  Filed 02/25/20  Page 60 of 75

INDEX NO. 151720/2020
RECEIVED NYSCEF: 02/18/2020

269.    At all relevant times, PwC had, and still has, more than four employees.

270.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Age Discrimination based on NYC Executive Law § 296(1)(a).

271.    These practices were, and still are, part of a systemic and concerted course of conduct engage in by PwC.

272.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Eleventh Cause of Action for the following relief:

    a.    Statutory damages;

    b.    Compensatory damages;

    c.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

    d.    Attorneys' fees; and

    e.    Such other relief which the Court or a jury may find or provide.

57

## TWELFTH CAUSE OF ACTION

### Gender Discrimination Based on NYC Executive Law § 296

**(Against PwC, PwC Advisory, Lavine, and Stahlmann)**

273.    Plaintiff repeats and realleges paragraph 1 through paragraph 272 as if fully set forth herein.

274.    Plaintiff is a female who was formerly employed by PwC and involuntarily terminated on April 7, 2017.

275.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

276.    At all relevant times, the PwC had, and still has, more than four employees.

277.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Gender Discrimination based on NYC Executive Law § 296.

278.    These practices were, and still are, part of a systemic and concerted course of conduct engaged in by PwC.

279.    As promulgated, such plan was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

280.    In both purpose and effect, however, PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of gender discrimination.

281.    PwC's discriminatory activities include, but are not limited to, the following:

A.    Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified female employees because of their gender, including Plaintiff;

B.    Establishing, implementing and maintaining policies and practices that have been, and still are, unlawful by operating to deprive qualified female employees, including Plaintiff, because of their gender, of the same wages, working conditions, job security, raises and promotional opportunities that are available to female employees;

C.    Establishing, implementing and maintaining practices, policies and procedures that have been and still are unlawful and discriminatory in purpose and effect in operating to demote, reassign and downgrade qualified female employees, including Plaintiff, because of their gender; and

D.    Establishing, implementing and maintaining policies, procedures and practices that have been, and still are, utilizing subjective, non-job-related criteria that, in purpose and effect, adversely affect the employment status of female employees, including Plaintiff.

282.    In particular, Defendants have established, implemented and maintained its policies, practices and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, female employees, including Plaintiff.

283.   As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from the defendant's job ranks a substantial number of female employees, including Plaintiff.

284.   Defendants, including PwC, have willfully discriminated against the Plaintiff, by the conduct identified herein, and thereafter, by discharging her on or about April 7, 2017, solely because of her gender.

285.   As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Twelfth Cause of Action for the following relief:

a.   Statutory damages;

b.   Compensatory damages;

c.   Punitive damages in an amount of Ten Million Dollars ($10,000,000);

d.   Attorneys' fees; and

e.   Such other relief which the Court may or a jury may find or provide.

60

## THIRTEENTH CAUSE OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964, as Amended-Gender Discrimination in Terms and Conditions of Employment 42 U.S.C. § 2000e et seq.

### (Against PwC, PwC Advisory, Lavine, and Stahlmann)

286.     Plaintiff repeats and realleges paragraph 1 through paragraph 285 as if fully set forth herein.

287.     Defendants have discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender.

288.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII.

289.     Defendants' differential treatment of Plaintiff is a direct and proximate result of gender discrimination.

290.     Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

291.     By reason of the continuous nature of Defendants' discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

61

292. As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

293. Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

WHEREFORE, Plaintiff demands judgment on the Thirteenth Cause of Action for the following relief:

    a. Statutory damages, including back and/or front pay as permitted;

    b. Compensatory damages;

    c. Attorneys' fees; and

    d. Such other relief which the Court or a jury may find or provide.

### FOURTEENTH CAUSE OF ACTION
### Retaliation

### (Against PwC, PwC Advisory and Lavine)

294. Plaintiff repeats and realleges paragraph 1 through paragraph 293 as if fully set forth herein.

295. Plaintiff engaged in a protected activity.

296. Defendant employer was aware that she participated in such activity.

62

297.     Plaintiff suffered an adverse employment action based upon such activity.

298.     Defendant employer acted in violation of local, state and federal law.

299.     A causal connection exists between the protected activity and the adverse employment action taken by Defendants.

300.     As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Fourteenth Cause of Action for the following relief:

a.     Compensatory damages;

b.     Attorneys' fees; and

c.     Such other relief which the Court may direct.

### FIFTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

### (Against All Defendants)

301.     Plaintiff repeats and realleges paragraph 1 through paragraph 300 as if fully set forth herein.

63

302.    As set forth more fully herein and above, Defendants engaged in unlawful, intentional, malicious and outrageous actions.

303.    At the time of said actions, Defendants were acting in their capacity as PwC, PwC Advisory and employees of the foregoing.

304.    The actions by Defendants were extreme and outrageous and beyond the bounds of decency tolerated in this society.

305.    The actions of Defendants were intentionally designed to cause Plaintiff severe emotional distress or were taken with reckless disregard of the significant probability of causing Plaintiff severe emotional distress.

306.    The actions of Defendants caused Plaintiff to suffer and she has been continuing to suffer severe emotional distress including anxiety, depression and loss of sleep as a result of the actions and/or omissions of Defendants.

307.    As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Fifteenth Cause of Action for the following relief:

a.    Statutory damages;

b.    Compensatory damages;

c.     Punitive damages in an amount of Ten Million Dollars ($10,000,000), as permitted;

d.     Attorneys' fees; and

e.     Such other relief which the Court or a jury may find or provide.

### SIXTEENTH CAUSE OF ACTION
### Prima Facie Tort

**(All Defendants)**

308.    Plaintiff repeats and realleges paragraph 1 through paragraph 307 as if fully set forth herein.

309.    Defendants intentionally inflicted harm on Plaintiff by the conduct identified herein.

310.    Defendants acted maliciously and out of indifferent malevolence toward Plaintiff.

311.    As a result of the foregoing conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Sixteenth Cause of Action for the following relief:

a.     Compensatory and or/or consequential and special damages;

b.     Punitive damages in an amount of Ten Million Dollars ($10,000,000);

65

    c.      Attorneys' fees; and

    d.      Such other relief which the Court or a jury may find or provide.

## SEVENTEENTH CAUSE OF ACTION
### Intentional Interference with Contract

**(Riporti, Calabrese and any non-partner John or Jane Doe Defendants)**

312.    Plaintiff repeats and realleges paragraph 1 through paragraph 311 as if fully set forth herein.

313.    To the extent the EA is an existing, enforceable contract between Plaintiff and defendants Riporti, Calabrese and perhaps some non-partner or principal defendants, deliberately interfered with Galli's business relationship and contractual relationship with defendants PwC and PwC Advisory.

314.    As a result of the aforesaid breach, Plaintiff may recover damages for tortious interference including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Seventeenth Cause of Action for the following relief:

    a.      Compensatory damages;

    b.      Punitive damages in an amount of Ten Million Dollars ($10,000,000);

    c.      Attorneys' fees; and

    d.      Such other relief which the Court may direct.

## EIGHTEENTH CAUSE OF ACTION
## Negligent Misrepresentation

### (All Defendants)

315.    Plaintiff repeats and realleges paragraph 1 through paragraph 314 as if fully set forth herein.

316.    At all relevant times, there existed a special or privity-like trust relationship imposing a duty on the Defendants to impart correct information to Plaintiff.

317.    Defendants, however, supplied information that was incorrect to Plaintiff.

318.    Plaintiff reasonably relied on the information supplied by Defendants.

319.    As a result of Plaintiff's reliance on such information, she has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Eighteenth Cause of Action for the following relief:

a.    Compensatory damages;

b.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

c.    attorneys' fees; and

67

    d.    Such other relief which the Court or a jury may find or provide.

## NINETEENTH CAUSE OF ACTION
### Fraudulent Misrepresentation

**(All Defendants)**

320.    Plaintiff repeats and realleges paragraph 1 through paragraph 319 as if fully set forth herein.

321.    At all relevant times, there existed a special or privity-like trust relationship imposing a duty on the Defendants to impart correct information to Plaintiff.

322.    Defendants, however, supplied information and/or representation that was false and/or incorrect to Plaintiff.

323.    At the time Defendants supplied such information and/or representations as identified in this Complaint, Defendants knew that the information and/or statements were false when made or that they were made recklessly without knowledge of its truth.

324.    Defendants' representations were made with the intention that the Plaintiff rely on it.

325.    Plaintiff reasonably relied on the information supplied by Defendants.

326.    As a result of Plaintiff's reliance on such information, she has been damaged as she has suffered and will suffer harm including, but not limited to, lost

68

earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Nineteenth Cause of Action for the following relief:

    a.    Compensatory damages;

    b.    Punitive damages in an amount of Ten Million Dollars ($10,000,000);

    c.    attorneys' fees; and

    d.    Such other relief which the Court or a jury may find or provide.

DATED:    February 14, 2020

ZEICHNER ELLMAN & KRAUSE LLP
Attorneys for Plaintiff Susan J. Galli

William T. Marshall, Jr. Esq.
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400

69

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                    Index No.:

SUSAN J. GALLI,

                            Plaintiff,

        - against -

PRICEWATERHOUSECOOPERS LLP;
PRICEWATERHOUSECOOPERS ADVISORY
SERVICES, LLC; JEFFREY LAVINE:
CATHERINE STAHLMANN; MARIA CALABRESE;
CHERYL RIPORTI; JOHN DOES 1-10, JANE DOES 1-20,

                            Defendants.

# SUMMONS AND COMPLAINT

## ZEICHNER ELLMAN & KRAUSE LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
TEL: (212) 223-0400
FAX: (212) 753-0396
www.zeklaw.com

FILED: NEW YORK COUNTY CLERK 02/18/2020 11:51 AM
NYSCEF DOC. NO.

INDEX NO. 151720/2020

RECEIVED NYSCEF: 02/18/2020

Case 1:20-cv-01640-LGS   Document 1-1   Filed 02/25/20   Page 74 of 75

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
-------------------------------------------------------------------x
SUSAN J. GALLI,

Plaintiff/Petitioner,

- against -                                              Index No.151720/2020

PRICEWATERHOUSECOOPERS LLP, etal.

Defendant/Respondent.
-------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

- serving and filing your documents electronically

- free access to view and print your e-filed documents

- limiting your number of trips to the courthouse

- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: __2/18/2020_____ ■

WILLIAM T. MARSHALL, JR.
_____
Name

Zeichner Ellman & Krause LLP
_____
Firm Name

1211 Avenue of the Americas, 40th Flr.
_____

New York, NY 10036
_____
Address

(212) 223-0400
_____
Phone

wmarshall@zeklaw.com          ■
_____
E-Mail

To:  Defendants_____

_____

_____

6/6/18