UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN J. GALLI;<br><br>                              Plaintiffs,<br><br>          - against -<br><br>PRICEWATERHOUSECOOPERS LLP;<br>PRICEWATERHOUSECOOPERS ADVISORY<br>SERVICES, LLC; JEFFREY LAVINE:<br>CATHERINE STAHLMANN; MARIA<br>CALABRESE; CHERYL RIPORTI; JOHN DOES<br>1-10, JANE DOES 1-10,<br><br>                              Defendants. | Case No. 1:20-cv-1640<br>(LGS)(SN)<br><br><br><br><br>**AMENDED COMPLAINT**<br><br><br>**(WITH JURY DEMAND)** |

Plaintiff Susan J. Galli ("Plaintiff" or "Galli") by her attorneys, Zeichner

Ellman & Krause LLP, by way of this Amended Complaint, alleges, upon information

and belief, as follows:

## THE PARTIES

1.      Plaintiff is a citizen and resident of the State of Florida and, during

the relevant time periods referenced in the Amended Complaint, maintained a residence in

the City, County and State of New York.

2.      Plaintiff was employed by defendants PricewaterhouseCoopers LLP

("PwC'), and/or PricewaterhouseCoopers Advisory Services, LLC ("PwC Advisory"),

from August 4, 2014 through April 7, 2017 at the Firm's headquarters located at 300

Madison Avenue, New York, New York.

3.      PwC is a limited liability partnership formed under the laws of the State of Delaware and is licensed by the State of New York to engage in the accounting and related businesses, including auditing and advisory services.

4.      PwC's ownership is comprised of individuals who are partners, in the case of individuals who are Certified Public Accountants ("CPA's"), and "principals," in the case of non-CPA's, who have a degree of equity interest in the firm.

5.      PwC is one of the "big four" CPA firms in the United States with annual revenue, during all relevant times, in the tens of billions of U.S. Dollars.

6.      PwC Advisory is an enterprise formed by PwC in Delaware in 2014; in the Spring of 2015 PwC registered and activated PwC Advisory to conduct business on behalf of PwC in New York, New York.

7.      Defendant Lavine, to whom Galli reported at PwC at relevant times, was a CPA, a lawyer, and a partner of PwC who is a citizen and/or resident of Washington, D.C.

8.      Defendant Stahlmann is a citizen of the State of Florida and was at relevant times  a "principal" of PwC, the equivalent of a partner, since in or about 2014.

9.      At all relevant times, defendant Cheryl Riporti ("Riporti") was and still is an employee in PwC's Human Resources Department in PwC's New York City office in the capacity of Human Capital Director.

10.      At all relevant times, defendant Maria Calabrese ("Calabrese") was an employee in PwC's Human Resources Department in its New York City office.

11.     The John Doe Defendants 1-10 and Jane Doe Defendants 1-10 were employed by PwC and are presently unknown by Plaintiff, but are believed to have played a part in the actions and inactions giving rise to Galli's claims.

**<u>NATURE OF THE ACTION</u>**

12.     Plaintiff brings this action against the above named defendants seeking legal remedies, including compensatory, special and punitive damages in such amounts as a jury, or this court, may deem appropriate, resulting from actions and inactions giving rise to sundry common law causes of action and  statutory claims resulting from discrimination on the basis of age and gender in violation of and/or pursuant to the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, <u>et seq.</u> ("ADEA"); the Civil Rights Act of 1964 § 7, 42 U.S.C. 2000e, <u>et seq.</u> (1964) ("Title VII"); the Federal Arbitration Act, 9 U.S.C. §1, <u>et seq.</u>("FAA"); the Declaratory Judgment Act, 28 U.S.C. § 2201;  the New York State Human Rights Law, Executive Law §296, <u>et seq.</u>   (the "Executive Law"), and the Administrative Code of the City of New York § 8-101 <u>et seq.</u> (the "NYCHRL"), attorneys' fees and costs.

13.     The common law and equitable causes of action derive from an oral and written employment agreement between PwC and Galli, i.e., PwC's failure to perform contractual duties or provisions pursuant to same or, if done in reliance on the contract, were unlawful or unenforceable; from the legal duty and public policy of, at least the State of New York by which one human being owes another human being, a duty, which is independent of or extraneous to a contract, that one individual shall not  harm another person, or his or her property, by fraud or oppression.

3

14.    Plaintiff also seeks declaratory relief voiding or reforming certain parts, of an Employment Agreement dated June 11, 2014 ("EA") and voiding the Arbitration Agreement ("AA") which was annexed and incorporated in the EA,  on the grounds of fraud, unconscionability and a violation of public policy.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction to hear and determine the matters set forth herein pursuant to 28 U.S.C. §1331, as certain of the claims in question are based upon a federal statute and federal questions. This Court also has supplemental jurisdiction under 28 U.S.C. §1367 as the subject claims arise from the same facts and circumstances as set forth herein.

16.    Venue is proper within the Southern District of New York pursuant to  28 U.S.C. § 1391(b)(2) because certain defendants herein are headquartered in this Judicial District and a substantial portion of the events/omissions giving rise to the claims occurred within this Judicial District as Galli was, herself, assigned to the New York office.

17.    Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 29, 2017, complaining of acts of discrimination alleged against certain defendants herein.

18.    The EEOC issued a "for cause" determination as to age discrimination.  The EEOC has been unable to resolve the dispute by mediation or conciliation, and issued to Plaintiff a "Notice of Right to Sue" by mail on November 15, 2019.  Plaintiff has exhausted her administrative remedies.

4

19.     Pursuant to § 8-502(c) of the NYCHRL, Plaintiff caused a copy of the Original Complaint to be served on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## OVERVIEW AND BACKGROUND FACTS

20.     At the heart of this controversy is, and has been, the conduct by defendants, including breach of their aforesaid duties, fraudulently and deceptively inducing Galli in or about June 2014 to leave her position as a Senior Vice President at a global bank to become Managing Director ("MD") of PwC's Regulatory Advisory Services ("RAS") unit; and the manner in which she was treated after she had agreed on June 10, 2014 to become MD of the RAS unit, whereby PwC and the defendants violated duties owed to her personally and under her agreement to assume the duties of MD.

21.     By reason of defendants' wrongful acts and omissions, Galli has suffered grave damages for which she must be made whole. PwC, PwC Advisory and its owners and employees must be deterred and enjoined from continuing their wrongful acts and gaming the U.S. legal and judicial system for illicit purposes.

22.     As a CPA firm, PwC and its partners and principals are subject to codes of ethics and conduct including the duties of integrity, independence, professionalism and basic respect for the rights and property of human beings.

23.     These representations and factors have garnered for PwC the trust and confidence of the public and its employees, including Galli, as well as governmental institutions, for its integrity and independence.

24.    It is based on this trust that PwC has succeeded in becoming financially successful and powerful, but with it brings with it the highest standard of integrity, ethics and professionalism.

25.    PwC touts itself as being a U.S. partnership with dedicated employees, principals, and partners; "providing an array of professional services to public and private companies, the federal government, state and local governments, and individuals;" and "performing those services with integrity, objectivity, and professionalism."

26.    PwC also touts its culture as one of inclusion and diversity; but in practice that culture is silent, for the most part, treating the older members of its work force as a valued and protected class.

27.    As any business organization, PwC acts and has acted through its partners, executives, employees, subsidiaries and affiliates, and agents (as identified herein) and has and will make mistakes and violate such duties.

28.    As such, PwC has an obligation, under certain circumstances, to report and self-correct any violations of those and other duties, and to make whole those who have been harmed as a result of its actions.

29.    This is a bridge which PwC is unwilling to cross.  Beginning in the first decade of this 21st Century, PwC has made conscious decisions and demonstrated, in its quest for business profits, power and market share, by its willingness to violate its oath as a CPA firm and pledge to practice its business with integrity, independence and professionalism.

6

**The New York Department of Financial Services ("DFS") Investigation**

30.     With a *nexus* to the case at bar, PwC demonstrated that willingness a dozen or so years ago to abandon its professional and legal obligations by going down the slippery slope leading to the development of a corrupt business model. PwC made a conscious decision to conspire with a banking client which had been was under investigation by the federal and state banking regulators for processing transactions which appear to have violated federal and state banking laws and regulations.

31.     In or about or before 2008, PwC had made an intentional,  wanton, calculated and unjustifiable decision to risk its license and entire professional reputation to curry favor with a client which was under investigation by U.S. Government and New York State banking regulators for possible violations of U.S. and New York banking laws and Anti-Money Laundering and Office of Foreign Assets Control ("OFAC") sanctions laws, rules  and regulations.

32.     The investigation involved allegations that the bank unlawfully cleared about 28,000 transactions worth about $100 Billion between 2002 and 2007 involving foreign entities suspected of Money-Laundering, sanctions evasion, and other crimes.

33.     This was and is critical and significant because money laundering and other banking crimes jeopardize not only the U.S. banking system but its National Security.

34.     The bank had hired PwC to develop an Historical Transactions Report ("HTR") of certain designated transactions to present to the regulators to assess the liability and severity of the suspected violations by the bank and remediate it.

35.     The banking regulators agreed to accept and rely on the findings of PwC in the HTR because of its perceived integrity, independence and professionalism and its recognition as one of the premier CPA firm.

36.     Motivated by profit and the desire to curry favor with its client, PwC abandoned its duties of integrity and independence as a CPA firm and disregarded that the regulators had become beneficiaries of its work.

37.     PwC agreed to make false and deceiving changes to the HTR, as requested by the bank, to affect the outcome of the regulators' decision as to what fines or sanctions, if any, might be appropriate for the federal and state regulators, led in the investigation by the DFS, to impose against the bank.

38.     The bank was found to have violated the laws or regulations and eventually was fined by DFS in the amount of $250,000,000 for its role in clearing the transactions involving sanctioned entities.

39.     Having later become suspicious of the bank's and PwC's conduct in connection with the report, in 2013 DFS launched a subsequent investigation into the bank as well as PwC's role in a cover-up of material information by the changes made in its HTR at the behest of its client.

40.     In 2014, as PwC perceived the investigation had come closer to its conclusion, it formed PwC Advisory and shortly thereafter became interested in recruiting

Galli, a recognized banking and Anti-Money Laundering (AML") subject matter specialist with many years of experience and a high profile in the AML industry.

**Galli's Recruitment and Employment Agreement with PwC**

41.     PwC recruited and hired Galli in 2014 when it was facing the above-mentioned existential crisis from its decision to abandon its oath and duties as a CPA firm and knowingly conspired and collaborated with a banking client to mislead federal and state banking regulators.

42.     From the time PwC recruited her, beginning in May 2014, to on about June 10, 2014, when PwC and Galli came to an oral agreement whereby she agreed to leave a secure job as a Senior Vice President of a global bank to join PwC as a co-leader of its RAS unit, PwC never disclosed this clear and indisputable material fact to Galli. Not only did PwC not disclose that the firm itself was at risk, but that the RAS unit, for which they were hiring her, was at the center of the problem.

43.     Stahlmann, Lavine, and others (she met with Riporti and at least two other partners), knew that Galli was being asked to give up a secure position at a global bank to join what could have turned out to be a sinking ship without telling her that the RAS ship had been hit by a torpedo and was taking on water.

44.     Not only was the firm at risk, but the financial advisory unit for which PwC hired Plaintiff to co-lead, RAS, was in the middle of the fraud and likely to be sanctioned.

45.     The concealment continued during her transition and until about two weeks after she had begun her employment with PwC on August 4, 2014 when she was actively employed with PwC.

46.     Galli was completely unaware of these developments, but Lavine, the CPA partner in charge of the unit at that time, and Stahlmann, a principal of the firm knew, or should have known.

47.     Certain defendants concealed this indisputably material fact and induced her to join PwC.

48.     At the time she was being recruited, Plaintiff had been employed in the City, County and State of New York by a global bank as a financial crimes compliance leader in banking and in the area of Anti-Money Laundering ("AML").

49.     Lavine and Stahlmann knew Galli as a banking and AML subject matter specialist, one who had served in the financial services industry for over 25 years.

50.     Galli is a Certified Anti-Money Laundering Specialist ("CAMS") and was an Advisory Board Member of the Association of Anti-Money Laundering Specialists ("ACAMS") from 2009 through 2019, a factor in her hiring by PwC.

51.     At the time of her hiring by PwC Galli had known Stahlmann for a period of more than a dozen years and they had developed a personal friendship and special trust relationship with her.

52.     Galli also had a trust relationship with PwC because of its standing as a CPA firm, and also having sponsored PwC with her aforementioned global bank

employer as one of the most prominent CPA firms, resulting in significant financial advisory work commencing in 2012.

53.    As a result of this and Lavine's stature as a CPA with PwC, Galli also relied on Lavine as trustworthy.

54.    At the recommendation of Stahlmann, in or about May of 2014, Lavine began to recruit Galli aggressively to persuade her to leave her position at the global bank and become an MD of PwC's RAS unit.

55.    Galli also met with Riporti and two other PwC partners.

56.    Lavine described the position of MD, for which PwC was recruiting Galli, to be the equivalent of a "non-equity partner" at PwC.  He represented that Galli would become, with him and Stahlmann, the third leader of the RAS unit, a position for which they deemed her to be uniquely qualified, since she was a banking and AML subject matter specialist with a broad compliance background.

57.    Lavine also represented to Plaintiff that PwC wanted to hire her as an experienced "catalyst" to help elevate PwC's profile in the area of financial crime compliance.

58.    Lavine told Plaintiff that PwC had been neglecting its marketing and practice development initiatives in the recent past few years due to understaffing and turnover of personnel; that she was being hired because of her high profile in the AML community and her extensive network of contacts; and that the purpose that PwC wanted to hire her was for her to provide PwC with greater "visibility" at key industry conferences and thereby raise the firm's profile and stature in financial crime compliance.

59.     But neither Lavine, Stahlmann or Riporti told her the real reason –
PwC was in deep trouble.

60.     PwC offered Galli an attractive compensation package to lure her
into leaving her secure and very senior global position with the global bank and foregoing
other opportunities as well as leaving an institution where she was already fully vested in
the retirement plan.

61.     Galli noticed during the negotiations that PwC had a separate AML
advisory unit which was part of its Risk Assurance line of service ("technical unit"), which
concerned her. She did not want to be involved with an internal squabble over territory, *i.e.,*
whether the other AML advisory unit would pose any internal competition to her with the
RAS advisory practice.

62.     Lavine represented and assured Plaintiff that she  definitely would
not incur such a problem because that was only a practice area of PwC which focused on
"technology issues" and that the individuals in that unit neither had Galli's specialized
subject matter knowledge nor her experience to handle the types of work done by the RAS
AML Advisory unit.

63.     Galli also asked Lavine during her recruitment if there were any
sales goals to the prospective position, because she had no interest in a sales-oriented
position, and specifically inquired whether it was an "eat what you kill" environment.

64.     Lavine assured her that she had no cause for concern, that sales
performance would only be assessed on a "team" basis, and not on an "individual" basis.

65.     PwC, through Lavine, offered Galli an attractive compensation package to lure her into leaving her secure and very senior position with the global bank wherein Galli would receive an annual salary of $420,000.00 plus benefits; that she would receive a special $50,000.00 signing bonus; that she would receive a minimum guaranteed bonus of $100,000; and that she would be eligible for a merit increase the following July 1st, for what was Fiscal Year 2015, ending on June 30, 2015.

66.     Galli agreed to the special relationship and job opportunity with PwC as described and told Lavine that the offer was acceptable to her.

67.     She suggested, to Lavine that November 2014 would be an appropriate starting date to allow her to transition from her existing job to PwC and carry out her vacation and travel plans which, in one case, involved a trip with her friend, Stahlmann.  But Lavine indicated that the date was not good enough, that PwC needed to get her on board as quickly as possible.  In doing so, Lavine assured Galli that she would still be able to take those trips she had scheduled for the fall of 2014. Galli agreed and committed to arranging an August 2014 starting date.

68.     Thus, on or before June 10, 2014, PwC, by its partner Lavine, had orally and mutually assented, for adequate consideration, to the terms and conditions of an employment relationship whereby Plaintiff agreed to assume certain duties as MD, a high-level executive position, and a co-leader of PwC's RAS unit, along with Lavine and Stahlmann.

69.     In sum, by reason of the foregoing, the parties reached a verbal agreement which included the above description of the job responsibilities; assurances that Galli was being hired as an AML subject matter specialist to enhance the firm's visibility

13

in the trade where she had recognition; that she would be the third leader of the RAS Unit; that her position as an MD would be the equivalent of a non-equity partner; that her position would not be affected by the other AML advisory service; and that she herself would not be held to any sales quota numbers in her personal annual evaluation, because she was not interested in a sales oriented position, particularly one with an "eat what you kill" condition.

70.     As a result of the foregoing, Galli had expectations that because of the special relationship, her high-level position and her status as a partner, albeit an non-equity partner, she would be treated as a senior level executive and, being one step away from partnership (like Stahlmann, a principal, since Plaintiff did not have a CPA license) that, at 59 years of age, she still had a future with PwC.  But little did she know, at that point, how wrong she was.

71.     Following her oral assent, PwC's Human Resources ("H.R.") representative sent Galli electronically, through a portal, a standard but apparently dated form Employment Agreement ("EA") and an attached Arbitration Agreement ("AA") which was incorporated by reference into the EA. She was asked to click the "save" button on the electronic transmission as an indication of acceptance, which she did on June 11, 2014, so that PwC could process her background checks and get ready for her transition to PwC.

72.     Following the Galli's verbal agreement described above, PwC caused a form letter and form EA with an attached AA to be sent to Galli by electronic means.

73.     Under pressure, and trusting PwC, Lavine and Stahlmann, on or about June 11, 2014, Galli clicked the box as saving and accepting the Employment Agreement, which was electronically returned to PwC.

**The Employment and Arbitration Agreements**

74.     PwC fraudulently induced Galli to leave her employment and join PwC by concealing material facts and making misrepresentations of material facts upon which she relied. The EA and AA were an integral part of that fraud – to lock Galli in and reduce her to less than an employee at will – to take away as many of her rights as possible, to treat her like a chattel or a pawn. It did that to Galli and it does it to others because the EA and the AA are form contracts written to heavily weigh in favor of PwC.

75.     The EA confirmed the oral agreement, containing all the requisite elements of a contract, hiring Galli as an MD and a subject matter specialist on an "at will" basis, and her compensation, including her annual salary; her eligibility for a merit increase based on performance for the Fiscal Year ("FY")  2015, which would have been effective July 1, 2015; a one-time signing bonus of  $50,000;  and a guaranteed minimum incentive bonus of $100,000 as well as, in  a general way, her benefits, among other things.

76.     The EA did not make any changes to her duties and responsibilities which she agreed to with Lavine, including the guarantees made by Lavine that she would not be subject to any individual sales goals, which would only be on "team basis." It also did not make any provision for changing the exclusivity agreement, the limitation on PwC that she would not be subject to intra-company competition for projects and work *vis-a-vis* the other AML (technical) unit; and it did not change her job responsibilities and other conditions she had agreed to with Lavine.

15

77.     The EA indicated in Section 19 that it could only be modified by a writing signed by the leader of her practice group, in her case Lavine. It also contained some standard provisions, such as that she would devote substantially all her time to the business of PwC.

78.     But the EA also had a collateral use. It contained some clauses which have a dual purpose – one for the reasonable protection of PwC, the other, if misused, for a sinister purpose to "handcuff" the individual and stifle competition. This was a purpose that a trusting and uninformed employee, such as Galli at the time, would not suspect or have any reason to question. Yet it would have a profound effect if she were to leave. And she had no plans to leave voluntarily, given the anticipation of working for PwC.

79.      Such provisions included the "non-solicitation" provision in Section 11, with its overly broad restraints and patently unfair remedies which permitted PwC to recovery 25% of any gross profits if the employee were to violate its strict provisions which are so broad that they are effectively a non-compete agreement, which Lavine admitted to Galli when she was terminated. This provision also made no agreement to compensate her for being "on the beach" for two years.

80.     The AA, if enforced, would strip Galli of valuable rights, such as the right to a jury trial or to participate in a class or representative action, in the absence of which she would not be able to protect disputed rights or to be made whole where she sustained damages in a court of law; and the veiled reference and incorporation of an ERISA plan without identifying it or providing the basic information required by law.

81.     These agreements are designed to protect PwC at the expense of employees and is contrary to the purpose of both the FAA and the ERISA law because by

marginalizing the individual and subjugating him or her to a status with fewer rights than an "employee at will" without individual rights to leave the firm and work elsewhere or compete against PwC. In the case of PwC, the EA and AA operate in tandem with each other and with the Severance Plan for the benefit of PwC and it alone. In this case, the agreements were procured by fraud, part and are parcel of the fraud, for the sole benefit of hiding PwC's misdeeds, such as its fraudulent conduct in inducing Galli to join the firm under false pretenses.

82.     In Galli's case the EA with its elusive reference to a Severance Plan, which was never provided to her while she worked at PwC nor afterwards until she hired counsel to obtain same. Calabrese falsely told her it was in the termination letter she had sent on April 7, 2017. Such action permitted PwC to abuse Galli with impunity.

83.     The AA is not what it is advertised. It is not less costly or more efficient. For example, it does not cover ERISA and claims, among others, which must be brought in federal court and requiring an adjunct proceeding in one or two venues, doubling or tripling the costs to the employee in some cases. ERISA claims are a laborious administrative process which requires an exhaustion of administrative remedies before a fiduciary which is on the payroll of PwC, and which has nearly absolute discretion. In Galli's case there is a clear conflict of interest with a strong bias and an unwillingness to provide documents to Galli, preventing a full and fair review.

84.     These three agreements have become an arsenal of weapons to frustrate Galli's efforts to recover benefits and damages for the fraud perpetrated on her. PwC can afford it. Galli and other individuals cannot.

85.     Thus, the EA, AA and elusive Severance Plan are an integral part of a carefully orchestrated fraudulent, deceptive and corrupt business practice. They are tools used by PwC, particularly in the case of Galli, to weave a tangled web of fraud and deceit. They are also used as a sword for corruption and for the intimidation and marginalization of employees, rather than as a shield to protect the legitimate business interests of PwC. They are used as weapons to suppress and frustrate the ability of individuals, such as Galli, who have been harmed by PwC, to seek a just resolution and be made whole.

86.     This scheme creates a costly, rigged procedure geared to discourage even the most passionate employee from seeking protection of basic rights under contract or under the federal, state, and local laws.

87.     The subject agreements are tainted by unconscionability in that Defendants failed to disclose to Plaintiff, prior to her entering into them, the full set of facts that would restrict her employment and the remedies related thereto.

**DFS Sanctions on PwC**

88.     On or about August 14, 2014, PwC agreed to a written Settlement Agreement.

89.     The Settlement Agreement prohibited PwC's RAS unit, the unit Galli has been hired to help lead, from acting as independent consultants for new business for DFS regulated banks for a period of two years and to be denied access to what is known as Confidential Supervisory Information ("CSI") for DFS-regulated clients for all new engagements.

90.     As a result, the bank was fined an additional $350,000,000 in November 2014, showing the significance, in terms of dollars, of the effect of PwC's falsified HTR. This brought the total fine paid by the bank to $600,000,000 ($250,000.00 +$350,000,000.00).

91.     PwC bought out of its existential problem by agreeing to pay a fine in the amount of $25,000,000, apparently the largest fine ever levied against a financial services advisory firm, for its role in the cover-up of evidence, but a paltry amount for PwC compared to its gross income.

92.     Although the fine was meant to be a penalty for its actions and as a deterrent to future dishonest acts, the fine imposed on PwC was a minimal portion of PwC's income for 2014, which, upon information and belief, was approximately $34 billion[1] and made PwC the sixth largest private company in America on the Forbes list.

93.     In negotiating the Settlement Agreement with the DFS, PwC had agreed to curtail the ability of RAS practice employees from working on new DFS projects and to submit a list of names to DFS.

94.     Galli's name was on that list without her knowledge or approval.

95.     In an attempt to mitigate the impact of the investigation PwC had formed, in 2014, a new legal entity, PwC Advisory, to consolidate its advisory business, by which it allowed PwC to largely avoid the sanctions.

---

[1]     The Forbes List of America's Largest Private Companies, 2014.

**Discovery of DFS Investigation and Sanctions**

96.     In the interim between June 11, 2014 and her start date of August 4, 2014, Stahlmann had confirmed Galli's duties as MD.  But even at that point she never disclosed the investigation to her friend, Galli.

97.     Plaintiff was "on-boarded" at PwC on August 4, 2014, during the 2015 FY which had commenced on July 1, 2014, and spent her first two weeks there in orientation. Her first day in the New York office was Monday, August 14, 2014.

98.     Plaintiff learned of the DFS investigation and the Settlement Agreement not through PwC, but through the media on or about August 14, 2014, when the information became effective and public.

99.     During the recruitment and hiring of Plaintiff, Lavine and Stahlmann knew, at that time, of the current status of DFS investigation and the factual circumstances of a pending settlement because they were equity partners and the practice leaders of the specific unit being investigated by DFS but never disclosed this information to Plaintiff.

100.     Lavine and Stahlmann also knew or should have known that severe sanctions against PwC were foreseeable and likely.

101.     Galli herself had no knowledge of the aforementioned DFS investigation at the time of her recruitment, during the transition period, or when she started at PwC on or about August 4, 2017.

102.     Such information was material because it would have influenced the whole nature of Galli's negotiations with PwC and her decision whether to leave her position at the global bank.

103.    The investigation of Defendants was a very serious, existential problem since it involved complicity by PwC with a client in suppressing information of the extent its involvement in processing transactions on behalf of sanctioned entities, which transactions were deemed to be a threat to the National Security of the U. S. and its banking system and likely involved crimes itself by PwC against the investigative federal and state bodies, not to mention its status as a Certified Public Accounting firm.

104.    It also was also foreseeable that by joining PwC under such circumstances, Galli would suffer material negative consequences, both personally and professionally, which she did.

105.    Lavine and Stahlmann did not disclose this to Galli because they knew that in that situation PwC needed someone with her knowledge and expertise, and knew she had other employment opportunities, including staying where she was, and knew that she would not have joined them had she been aware of PwC's misconduct and its potential impact on her personally, and her career.

106.    Lavine and Stahlmann put pressure on Galli to join PwC as soon as possible.  They knew that sanction by DFS was imminent; however, they did not reveal the true reason for wanting to hire her because if she knew, Galli probably would decide not to join PwC.

107.    PwC knew at the time of its recruitment and/or hiring of Plaintiff, that it was about to enter into a very unfavorable settlement that would not only impact its reputation, but impair its ability to conduct business with an entire set of key clients or client prospects.

108.    Instead they lured her with an attractive contract but saddled her with a restrictive covenant and other restrictions, including the AA, and the Severance Plan, over which PwC had total discretion to lock her in as an at will employee with no place to go.

109.    Clearly, had she known of PwC's regulatory problem, she most certainly would not have signed the EA and most assuredly she would have hired a lawyer before agreeing to sign such a contract considering the materiality of the facts which defendants failed to disclose to her.

110.    Lavine and Stahlmann also failed to disclose to her that PwC had formed a new entity, PwC Advisory, which was expected to have a profound effect on the RAS unit.

111.    Concerned about this material development, in August 2014, Plaintiff approached Lavine immediately and requested she be transferred to another practice area of the firm, but Lavine summarily refused her request.

112.    Lavine declined to do so indicating her name had been submitted with a list to the DFS pursuant to the Settlement Agreement and represented to Galli that the firm might look bad in the eyes of the DFS and might question her transfer, if he were to do so even though Galli had nothing to do with the matter that led to the investigation and Settlement Agreement which occurred at least six years before she joined the firm.

113.    Galli requested that her name be removed from the DFS list.  Lavine summarily refused to take such action.

114.     Lavine's statement that he could not discuss her situation with the DFS was also false because there was a provision in the settlement agreement providing for regular dialogue between PwC and DFS.

115.     These statements by Lavine were false at the time, as Galli later found out (after her termination) the DFS settlement agreement itself would not have posed an impediment to prevent PwC from moving Plaintiff to another unit, particularly since Plaintiff was a new employee with no *nexus* to PwC's sanctioned conduct and since PwC was in control of providing the names of the relevant employees to be the subject of the sanctions.  The Agreement, that was published in August 2014, also allowed for regular dialogue between PwC and the DFS.

116.     In light of the foregoing restrictions due to the DFS settlement, and the restrictions in the EA, Plaintiff felt she was essentially trapped at PwC and would be greatly hindered in her ability to personally provide services to DFS-regulated clients.

117.     The fact that PwC was publicly sanctioned also put the firm itself as well as her, an MD, at a distinct competitive disadvantage vis-à-vis its competition.  In fact, PwC lost multiple proposals for DFS-regulated banks during the two-year ban.

118.     Lavine falsely assured Plaintiff, and other employees of the AML Advisory practice RAS unit as well, that they should not be concerned about the sanctions because it was only a two-year ban and that it did not pertain to projects in place at the time of the ban.

119.     Lavine assured Galli and other members of her team that there were enough projects at PwC which were exempt from the ban to carry the unit (and, therefore,

the team) through its expiration in August 2016. But Lavine's representations proved to be false. As the head of the unit, he knew or should have known the truth.

120. Not knowing the falsity of Lavine's remarks, and based on those promises and assurances, Galli continued in her job and proceeded to carry out her responsibilities to the best of her ability for the remainder of (FY)2015.

### PwC Fiscal Year ("FY") 2015: Fraud Discovery But Banner Year

121. Despite the above Galli, feeling trapped with a restrictive covenant in her EA and based on the assurance and representation by Lavine that there was enough work which was exempt from the sanctions, Galli felt she had no real choice and, with a guaranteed income and bonus, which she needed, she persevered in her service to the firm.

122. It is well documented that Plaintiff had a banner Fiscal Year (FY)2015. She was thoroughly evaluated and rated a "High Performer" and was pegged as a "Leadership Champion" for PwC's talent transformation process it had rolled out in 2015.

123.  Plaintiff received her promised 2015 bonus in the amount of $100,000.

124. But PwC reneged on Plaintiff's eligibility for a merit increase, contrary to her EA and performance rating, a breach of her employment agreement by PwC. She  since learned that because she was near the maximum  pay for an MD the only way for her to have received a merit increase was for her to be promoted, which had to have been to a partner  (for non-CPA's known as "principal") her age of 60 years precluded her from eligibility, despite the conditions of her contract.

24

125. This was a clear violation by PwC of its employment agreement with Galli or at the very least, a misrepresentation of a known fact at the time she was hired.

**FISCAL YEAR 2016 :Metamorphosis**

126. In the Spring of 2015, unbeknownst to Galli, the MD of the RAS unit, and concealed by PwC, Lavine and Stahlmann, about nine (9) months into its two-year ban imposed by DFS, PwC had registered PwC Advisory as a company doing business in New York.

127. Shortly thereafter, PwC transferred all of PwC's U.S. Advisory personnel into this entity without prior notice or explanation to Galli or the employees.

128. In or about July 2015, several things happened which fomented a culture of deception and discrimination at PwC, with Galli being one of the targeted victims. Essentially, PwC adopted and acted out a culture not only adverse to the law, but to its own code of conduct and those required by the standards of the accounting profession.

129. Galli and other PwC's employees were eventually told that they had been transferred into the mysterious new legal vehicle, PwC Advisory, but were never given anything in writing or asked to re-execute employment agreements with the new entity.

**The FCU Brought The Younger Culture and a Breach PwC's Agreement with Galli**

130. Around this same time, PwC also formed a new business unit called the Financial Crimes Unit ("FCU") which brought together several disparate practice areas, each of which performing various aspects of Financial Crime advisory work for PwC on behalf of clients, mostly banks, some of which were under the supervision of the NY DFS.

131.    As part of this consolidation, the FCU created an internal "joint venture" between the employees, principals and partners in the technology unit, also known as  ARCA, whom were not bound by the letter of the DFS sanctions, and the other advisory employees in the FCU, some of whom were also not subject to the sanctions.

132.    This was a daring, deceptive, reckless attempt by PwC to circumvent the DFS sanctions, without the knowledge of DFS, a clear violation of the Settlement Agreement. The RAS unit subject to the DFS Settlement Agreement had essentially been dissolved, without the knowledge or consent of DFS.

133.    This "joint venture" brought more employees, partners and MDs, many of whom were clearly younger than Galli, into the FCU and working on AML engagements, and internally it created an unlevel playing field for project work since only the former RAS unit employees were constrained from working with DFS-regulated clients.

134.    In 2015, with the creation of the FCU, there was suddenly a high number of younger MDs and partners vying for control of the combined practice; yet PwC continued to bring over younger Partners from other, outside firms or bring in Partners from PwC member firms overseas when there was clearly no need for additional partners or MDs in the U.S. practice. Galli was more qualified in her specialty as those individuals and had more experience.

135.     Galli noticed at this time that she was increasingly not being included in challenging assignments or projects, and that these were being directed to younger, less qualified male partners or directors.  This tactic was demoralizing and frustrating to Galli,  the net result being to deliberately make Galli feel less valuable and

less effective in her role because it generally cut her off from meaningful and billable interaction with clients which affected both the ability to generate new business and contribute to billable hours on existing engagements, which was the defendants' intent and purpose.

136.    During FY2016 Galli was increasingly tasked by Lavine with initiatives, that while beneficial to the Firm and furthering the performance goals of the PwC Professional Framework and employee development, did little to contribute or relate to her "utilization" or revenue goals.

137.    Examples of such initiatives were Lavine's request for Galli to be the champion for the roll out of the PwC Professional Framework including serving as a relationship partner for 12 Senior Associates in 2015 and another 24 in 2016, serving as the Diversity Partner (even though she was only an MD) for the 2016 Career Roundtable, and coordinating marketing events for RAS both at conferences and in-house, as well as coordinating training for RAS employees.

138.    Galli was also frequently asked to review project deliverables for projects that she was not formally assigned to, and thus did not receive any sales or utilization credit for them.

139.    She was also assigned by Lavine to work with the Global Financial Crime leader in the UK to represent PwC US at those meetings, and to help develop a business plan and strategy for global PwC clients for financial crime work.

140.    While these activities contributed to the success of the practice, they did not contribute at all to Galli's personal sales or utilization goals which had been set up for her, and, took up a great deal of her time.

141.    It later became transparent that Galli's FY16 evaluation would be based solely on revenue metrics, so no consideration was given to any of the other work she did at Lavine's direction.

142.    Over time, and as the number of these administrative projects increased, Galli also began to notice that her authority was becoming limited and she was being cut out of certain partner meetings and excluded from prime client opportunities which were being diverted to younger male Directors and partners from the other financial crime practice units that had become part of the FCU.

143.    For example, Galli had specifically been tasked to represent PwC U.S. at the meetings of global PwC firms to devise and build a global business plan. However, when the FCU was formed, the new younger male head of the FCU took over as the liaison with the global PwC firms, and Plaintiff was excluded from them even though she continued to be "invited."  That is, the FCU head indicated that he would attend, if anyone from the US attended, and essentially made it clear that nobody else from the US should travel to participate.

144.    And while Galli worked with the Global AML Partner lead on the sales strategy and business plan for AML, although eminently qualified, she was  not named as a lead client liaison for any of the top target clients since those roles were assigned to younger male partners with less experience and industry knowledge.

145.    Plaintiff was, on several occasions, told by PwC's risk partners that she could not work on specific projects due to the two-year ban. Lavine, however, insisted on putting her on certain projects as an "investment" to win other work from a potential client, which meant she would not earn any credit for utilization or revenue.

146.    Lavine had repeatedly assured her that this would not negatively impact her evaluation, and Galli relied on these representations and assurances.

147.    Contrary to Lavine's representation, this was false, and it was held against her, without her knowledge at the CRT when he did not advocate for her.

148.    Plaintiff was also removed from other jobs on which she had done work, in favor of placing other younger male partners on them.  In addition, she was often instructed not to bill her time on certain projects.

149.    In February 2016, it was announced that the AML Regulatory Practice was bringing in a direct-admit partner from another accounting firm, a significantly younger male estimated to be in his forties.

150.    This increased the number of partners in the RAS to three, and he eventually wound up replacing Galli.  Initially, Lavine represented to her that the new partner would be bringing over his own portfolio of clients, focusing on "gaming and casino" clients, but when the number of projects coming from the gaming clients was relatively small in number, that partner was encouraged to, and began working and encroaching on Galli's existing banking contacts that she and the existing two partners already had or had been working to cultivate.  This was another material misrepresentation upon which she relied.

151.    The new partner was also clearly being given priority on new engagements, and rather than assigning any of these engagements to Galli, the new partner was assigned to multiple engagements at the same time. This was done even though Galli had an equally strong relationship with the clients and had more relevant banking experience for the projects being undertaken than this new partner, and other new partners from the technology unit that were also encroaching on advisory work.

152.    Galli was given no role in, or credit for, bringing in one of the projects even though she had initiated contact with the client who was a former banking colleague of hers, and on the other project, she was removed from the project after three months and the three younger male partners remained on it, even though she was the one that had the relevant banking and product experience for the project.  She was tapped to provide subject matter expertise even after being removed from the project, but she was not able to bill her time or earn revenue credit for the project.

153.    When she was recruited, Galli had been told that as an MD she would be like a non-equity partner.  However, she was not treated as such and later learned she could never be promoted to partner, as PwC enforces a mandatory retirement age of 60 for its partners, which in and of itself, is illegal.

154.    In practice, younger, less experienced directors and MDs, were being promoted to the partner/principal level, and while an MD had the same level of responsibility as a partner, had a higher hourly billing rate than did younger, less experienced partners, the level of authority that an MD actually had was much less, since an MD is considered an employee and not an owner of the Firm, and does not receive any

30

of the benefits upon leaving the Firm that partners do, such as a guaranteed pension and paid health benefits.

155.    Since Galli joined the Firm when she was 59 and a half, she clearly was denied any opportunity for advancement or future promotion since she was almost at the age milestone that the Firm had chosen for partners to retire, and the only position more senior to MD is partner or principal.

**Change in Performance Management: Forced Rankings**

156.    PwC also made some changes to its performance management process during Galli's tenure and implemented forced ranking, and also established salary cohorts which significantly disadvantaged older employees.

157.    While the firm did away with lengthy written performance reviews, and implemented the use of performance "snapshots" to capture relevant feedback about each employee based on five performance attributes, in reality, the forced ranking performance reviews which are called "career roundtables" took place behind closed doors where practice management leaders ranked employees numerically from top to bottom.

158.    The meeting did not end until the distribution requirements of the forced ranking were met regardless of whether all of the employees being ranked were stellar.

159.    The impact of this at PwC was that unless you were rated 1-3, there was no possibility of a promotion or discretionary bonus.  If you were a 4, you were not eligible for a bonus and depending on the reason for the 4 rating might be put on a

31

performance management plan. A repeat 4 would typically result in a layoff. And if you were a 5, you were generally let go immediately.

160.    This forced ranking was also combined with a new pay system based on salary cohorts that set maximum salaries for each employee level. That meant that even if you were a stellar performer were rated a 1, you would not get any salary increase if you were already making at least the highest salary for your salary cohort.

161.    The results of Galli's annual evaluation for FY2016 were deferred and not communicated to her until the end of July 2016, the beginning of Fiscal Year 2017, but the report on her was not signed officially until August 26, 2016.

162.    Her FY2016 annual review was falsely and unjustifiably downgraded, under the prevailing circumstances, her agreed-upon terms of her job description and responsibilities, Lavine's promises and representations, from a "High-Performer" to a "Needs Improvement."

163.    The effect of this rating was to disqualify her from any bonus or salary increase and it is transparent that it was malicious and intentional.

164.    The prime reason given for the rating was a failure to attain the desired sales and utilization goals. No consideration was given to the fact that Galli had been under the DFS settlement constraints for the two years, essentially during the entire time she had been employed by the firm or that she was repeatedly and intentionally assigned to projects that did not contribute to sales or utilization by Lavine. This also contradicted the representation made to her by Lavine when he hired her that she would not

be held to a sales, or "eat what you kill" standard. And that sales were evaluated on a "team" basis**.**

165.    Further, in her May 2016 meeting with Lavine, at no time did he tell Galli or document any serious performance issue that was going to lead to an unfavorable performance rating.

166.    As stated, Galli had been rated as a High Performer the prior year, and, therefore, if Lavine was intending to rate her as "Needs Improvement", there should have been discussion and documentation to that effect prior to the CRT and a conversation with Human Resources.  None of that occurred.

167.    During the May 2016 performance review that was held for employees who were directors and below, Galli participated as the designated diversity partner, and it was announced that there would be a mandatory cut of a pre-determined number of employees since this had been mandated across the Advisory line of business.

**Forced Rakings Adversely Affect Older Workers By Design**

168.    When a firm, such as defendants, wants to make budget cuts, forced ranking generally targets older employees, but to do so, requires them to be ranked in the lower categories at a disproportionately higher rate.

169.    By facilitating the actual or constructive discharge of its older (and generally more expensive) employees, it enabled the employer to fulfill its purpose of achieving and maintaining a relatively younger (and less expensive) workforce.

170.    The key flaw in this process at PwC was that the rankings fostered mistrust since the fate of employees depended not solely on their performance but also on their manager's effectiveness as advocates in the career roundtables or the managers' own relationships with other, more senior partners. Even if the practice area and the employees had done extremely well, some employees had to be relegated to the lower categories whether they deserve it or not.

171.    The older employees at PwC (who tended to be Directors or above), many of whom had been working at the firm for years successfully, all of a sudden were being categorized as "resistant to change and innovation", unwilling to travel, and the like.

172.    These individuals went from being valued and loyal employees to performance problems almost overnight. Ridding the team of a few senior employees with the associated higher salaries, freed up budget dollars to use for raises and bonuses for the younger employees who remained. There seemed to be a pervasive attitude that the older employees at PwC should ride off into the sunset to make room for the new partners.

173.    In May 2016, just prior to her CRT annual review, Lavine asked Galli her what her future plans were, a code suggesting that she might like to retire or that retirement might be in her best interest, but Galli immediately pushed back.

174.    Her response to Lavine was that she had given no thought to leaving the Firm as she had only recently joined and was very happy at the Firm other than the fact that she felt that she was being under-utilized.

175.    Parenthetically, that comment was made a few months before her 61st birthday, and she believes Lavine knew, and should have known her age, more or less,

from her years of experience and because she had to provide her birthdate during the onboarding process.

176.    Again, Galli knew that PwC partners have to sign contracts obliging them to retire at 60, however, there was no language about a mandatory retirement age in her MD Employment Agreement, and she wasn't about to engage in such a discussion. Lavine also did not offer any incentives for Galli to retire.  But it was clear PwC was trying to push his age-protected female out.

**Retaliation of Galli**

177.    In Galli's  case, she was asked about her retirement plans in May of 2016, and when she indicated that she had no intention of retiring, two months later she was rated as "Needs Improvement" told that she needed to increase my sales and utilization numbers and should be meeting with at least 6 clients on a monthly basis and always to be accompanied by a technology partner, code for a younger, less experienced employee.

**FY2017: More Deception**

178.    Galli was well on the way to making her utilization goal, when she was pulled off a project because she insisted, consistent with firm policy, that she bill her time.  Also, even though sales goals were supposed to be assessed on an annual basis, she was assessed as not having met her annual goal despite the fact she was only 6 months into the performance cycle.  In other words, PwC was not even giving her the opportunity to attain the goal.

179.    PwC simply wanted Galli out of the way to make room for a new, younger Partner, and by letting her go a few months shy of her 62nd birthday, she lost 60% of the retirement benefits that she would have been entitled to since she was not fully vested until her 62nd birthday. PwC's timing was intentional to save additional money and not have to pay her full retirement benefits.

180.    In the months between the CRT review and the finalization of the evaluation, Lavine and others had come up with a pretext for punishing Galli for standing and addressing truth to power. This was an intentionally dishonest and unfair, subjective evaluation which forced the creation of false statements and records which essentially allowed partners to engage in a popularity contest to reward their favorite employees.

181.    Galli was falsely rated as "Needs Improvement," apparently based solely on her 2016 annual utilization of 15%, resulting from the above deceptions and discriminatory actions against her which reduced her billable work time (i.e., utilization) or gave her no credit for work actually performed or that she helped to win but for which Galli was specifically told not to bill based on instructions from a Partner, usually Lavine or Stahlmann.

182.    Had Galli received credit for that work, and had she not been prohibited from working on certain DFS engagements, it can be demonstrated that she would have achieved those targets. This was another example of a deliberately false and fraudulent way of depriving her of a just wage, marginalizing her before her peers and reports, and providing a pretext for firing her.

**Utilization Goals Clear Violation of the EA by PwC and a pretext**

183.    Starting in the 2015/2016 performance year, the partners were also given utilization goals of 35% which they did not have before, and MD utilization goals were increased from 35% to 45%.

184.    At this point, the partners began allocating all of the senior project time for themselves, and MDs were typically staffed only on projects that the MD had directly won from personal contacts, or in Galli's case, when she was asked to co-lead a project since the partner was busy on another project or on vacation.  The "catch-22" was that she was then told not to bill her hours which meant zero utilization and grounds for a lower rating.

185.    The exclusive focus on Galli's sales activity and utilization was also inconsistent with the PwC Career Progression Framework launched in September 2014. This performance management system was intended to evaluate each employee's performance based on <u>five</u> performance attributes, not just sales and utilization.

186.    The partners have completely ignored this and focused solely on sales and utilization, another pretext for discriminating against Galli. Furthermore, the performance "snapshots" that Galli obtained during the performance year did not indicate or support any performance attributes that required development actions.

187.     In fact, Galli was rated "at level" or "at next level" for all five performance attributes in all of her performance snapshots, demonstrating that PwC created false employment records as insurance against wrongful acts committed against her.

188.   At no time was Galli placed under any written Performance Management Plan, as it would have been customary, nor were there ever any conversations with Human Resources about any performance development needs.

189.   Based on the June 2014 agreements, representations and assurances by Lavine to Galli, although  utilization and sales numbers were automatically calculated, these metrics should not have been  applied as a material factor in her evaluation, but apparently were the sole factors, in the 2016 Annual Review to create a false record to support her downgrading, a retaliation for not agreeing to take an early retirement.

190.   And while the results of the annual CRT performance evaluations were supposed to be communicated to staff no later than July 1, 2016, but preferably by mid-June, in Galli's case, the results of her 2016 rating were delayed and not communicated to her until the end of July 2016.

191.   Uncharacteristically, the Review itself was not signed formally until August 26, 2016. Clearly, Lavine and others involved in the process were setting Galli up for failure, a violation of the basic obligation from one human being to the other.

192.   All that year Galli had been assured that she and others would not be penalized for the utilization issues described above, particularly as they related to the DFS restrictions.

193.   Lavine clearly did not address the reason for Galli's low utilization was beyond her control, or articulate all of the other things that Galli had accomplished throughout the year, and allowed her to be rated as "Needs Improvement as part of the force ranking." Lavine intentionally set her up for failure and failed to take action to avoid

damage to her person and business as an AML specialist. This meant that not only did she not receive any increase, but she also did not get any discretionary bonus.

194.    This deceptive, demeaning, dishonest and fraudulent performance rating also was a pretext to reward younger, less experienced males and set her up for a pretextual termination in favor of younger males.

195.    Galli fully expected to be able to finish out the performance year and was making every effort to focus on client pursuits and increasing her utilization, and she was inviting one of the technology partners to participate in these efforts.

196.    The subject review was skewed and contrived and not supported by the comments made by her evaluators throughout the performance year.  Clearly, this was the result of her remarks in May 2016 meeting with Lavine, that she was not ready to retire and that she was going nowhere voluntarily.

197.    At no time during the post-CRT meeting did Lavine indicate to Galli that she was in any kind of a program or that she was in any jeopardy of losing her job. In addition, the evaluation was contrary to the representations that Lavine made when she was hired and the subsequent promise he made when the DFS two-year ban was announced.

198.    That is, Lavine had indicated to all employees in a public call that the restrictions on RAS employees would not personally negatively impact them. This, however, was not true which Lavine knew or should have known since not only were RAS employees personally banned from performing this work, but several key project proposals were lost to competitor firms because of the DFS issue.

199.    As it happened, Galli was several years shy of being eligible for Medicare benefits and months away from vesting on her ERISA-based retirement and PwC wealth-builder accounts.

200.    By terminating Galli when it did, PwC caused Galli to lose 60% of her retirement benefits that were not fully vested, something she could ill afford at this stage of her career and something that would redound to PwC's economic benefit.  It also allowed PwC to deceive Galli by seeking a waiver of all her claims against PwC by using monies it owed her as consideration for the general release.

**Fiscal Year 2017: More Deception and Galli's Termination**

201.    DFS did not release PwC from the sanctions until August 2016, but did not confirm this to PwC until October 2016.  (Galli was never informed that the sanctions were formally over and the oppressive and discriminatory acts against her continued.)

202.    As part of her post-CRT discussion with Lavine, he urged Galli to initiate more monthly client meetings and to invite along a colleague from the technology unit on these client calls.

203.    Lavine told her she should be having five (5) to six (6) client meetings per month, and that she should be taking other members of the AML team, particularly technology teammates, to client meetings. These other members happened to be all younger males, in retrospect, although it was not disclosed to Galli, it was a transparent effort to ensure that the younger culture was introduced to Galli's extensive

network of contacts.  It is also apparent, in retrospect, because there would be no reciprocity from the younger employees.

204.   This was a logistical challenge if not an impossible goal, likely unachievable and a pretext for Lavine to set Galli up for failure.

205.   This was so because at that time Lavine assigned Galli to an engagement requiring her to be in Washington, D.C. three to four days per week, and Lavine knew, because he was based in the District, that the Firm did not have many financial institution clients in the D.C. area, save the one she had already been  working with at the time.

206.   Despite this, Plaintiff organized as many meetings as she could, under the circumstances. Where feasible, she invited technology colleagues to participate as suggested but it was generally not reciprocal.

207.   It became patently clear that Plaintiff was inviting people to her meetings, but generally, with the exception of one male Partner, she was being isolated from sales opportunities. There was little reciprocity in the younger PwC employees by including Plaintiff, an older female, to their sales and client meetings.

208.   Galli also was sent to Europe twice during the Fall of 2016 to meet with senior client contacts that she had with a major German bank, and also collaborated with her colleagues in PwC Milan on an opportunity with an Italian bank.

209.   Despite the aforementioned adverse developments and Lavine's intentional and malicious deceptive actions, by August 2016, two months into FY2017, Galli's utilization had been approaching 38% on her existing project, a sure sign that she

Case 1:20-cv-01640-LGS   Document 22   Filed 04/02/20   Page 42 of 85

was achieving the goals set for her, but when this became clear, Lavine or others caused her to be abruptly removed from the sole project on which she had been working.

210. To compound this insult, Plaintiff was instructed <u>not</u> to bill her time on the project, as the client had been complaining about the project cost, over which Galli had no control. Not only by not being able to submit her time, it negatively impacted her evaluation in the prior CRT, and it was contrary to Firm policy which in her EA she was bound to follow.

211. In an attempt to counteract this, Galli submitted all of her billable time, so the other partners would know she had been actively working, the partners retaliated against her and removed her from the project. Had Galli not billed her time, as the partners were instructing, most assuredly, her utilization time would have been 0% and set her up for failure.

212. This conduct by Lavine and perhaps others violated PwC's Employment Practices Policies and Procedures, revised 11 May 2016, Section 3.3, which state:

> **"Maintaining a discrimination and harassment-free work environment:** It is against the law and firm policy for any firm personnel, including partners, supervisors, managers and coworkers, as well as clients and other third parties, to discriminate against or harass any other firm personnel based on any of the protected characteristics listed in section 3.1 or any other status protected by law. Harassing behavior may involve causing discriminatory intimidation, ridicule, insult that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment, as viewed from the perspective of a reasonable person."

213.    By excluding Galli from meetings with the client and including junior partners without the requisite regulatory and product experience solely so they could rack up their own utilization and sales numbers, and by attempting to pressure Galli to violate Firm policy and not bill her hours, this constituted harassment and created a hostile work environment.

214.    In addition, the above intentional and malicious wrongful acts constituted a fraudulent and / or deceptive attempt to harm her and her business, and violates the duties owed to her independently from, or extraneous to, any contractual agreement, and were unjust and unnecessary.

215.    Galli did not think at the time that it was prudent to file a complaint with Human Resources, as that essentially would have made the hostile work environment even more toxic and possibly would have eliminated any chance of having a productive working relationship with any of the partners.

216.    At this point, Galli was in a protective mode from the corrupt and unconscionable provisions in the EA and AA.

217.    Although by that time PwC had apparently determined to terminate Galli, she was never given formal written notice of her termination as required by Section 19 of the EA.

218.    On January 23, 2017, defendants Stahlmann, Riporti and Calabrese conferred on how best to terminate Galli and force her to sign a general release of all defendants' wrongdoings.

219.    On January 26, 2017, Lavine called Galli to his office and had a brief conversation with her. Lavine told her that "he could no longer defend her," and that the Firm was making a list of individuals to lay off.

220.    Although Galli had been performing at a pace to meet her forced goals, there were still six months left in the performance year.

221.    Lavine never told Galli she was being terminated but that he would have a meeting with her and a person from HR on February 1, 2017 to discuss things further. But that meeting never took place as Lavine was not present in the New York office that day. Galli appeared and tried to reach him but her efforts were unsuccessful. She learned that Lavine was out of the office, apparently on a business trip, and never rescheduled any such meeting.

222.    Later in the month of February 2017, while on a previously scheduled vacation, she was contacted by Stahlmann to join her on a project abroad because she had helped to win it and she was the only subject matter specialist with the necessary business experience to carry out the project.

223.    There was no discussion of an imminent departure, or disclosure that Stahlmann had had a meeting with Riporti and Calabrese on January 23, 2017.

224.    After Galli's return from the job abroad, she attended an industry conference in Florida, the state where both she and Stahlmann reside.

225.    At the conference, Stahlmann asked Galli if she had heard from Lavine.

226.    Galli never saw or spoke to Lavine again until April 4, 2017, when she was attending an industry conference which he also attended (three days before her actual termination).  Galli was attending the conference as an ACAMS Advisory Board member and speaker.

227.    At that that time Lavine told Galli that if she were to decide to go out into business on her own, she would be free to do so, because the Firm would not seek to enforce the restrictive covenants in her EA, whereas PwC would feel otherwise and not be receptive to her working for another competitor firm.

228.    This was an admission by Lavine that the restrictive covenants in the EA were to stifle competition which is unlawful.

229.    Galli sent Lavine correspondence to try to clear up the restrictive covenants, but he never responded as to whom she would be able to solicit.

230.    PwC terminated her from employment on April 7, 2017, but the harassment continued.

231.    Shortly thereafter, PwC gave instructions to its vendor to cancel Galli's Health Care Spending Account, which should have remained available to her until the end of April 2017, and they reversed several payments that had been made to American Express for authorized charges on Galli's corporate Amex card which caused Galli's account to become delinquent.  Galli had to spend many hours working with a substitute admin to resolve the American Express issue, and the Health Care Spending account money was never made available to Galli for her authorized expenses.

232.    During all of this Lavine and Calabrese neglected and ignored most of Galli's requests for assistance.

233.    Following her termination, Plaintiff received in the mail an unsigned letter dated April 7, 2017 confirming her termination and containing within it a proposed Agreement and General Release ("A & R") in favor of PwC, its subsidiaries, partners, principal, and employees ("Termination Letter").

234.    In an effort, to try to intimidate her for refusing to sign the A & R, PwC was "slow walking" payment of her final authorized travel and entertainment expenses which caused her corporate credit card account to become delinquent, as well as not providing her with requested information about the PwC Notice/Severance Plan.

**Agarawal's and Sabatini's Loose Lips**

235.    Defendants' pervasive trend to advance younger, less qualified employees to replace more experienced, and undoubtedly, more expensive ones, was best articulated by a Partner, Vikas Agarwal when Galli ran into him at the September 2017 ACAMS Conference in Las Vegas.

236.    Galli learned that shortly after she the firm, John Sabatini of PwC had been made the head of the AML practice. Agarwal mentioned that PwC partners have to retire at 60 and said that the firm wants "to make room for younger partners who are hungry." Agarwal also indicated that older partners/employees are overpaid and not contributing, and that the older employees need to go to make room for the younger ones coming up through the ranks.

**Favoring the Millenial: Trite but True**

237.   Other examples PwC's favoring of the millennial culture were evident in just about everything it did.  For example, the PwC spent thousands of dollars in 2015 implementing google email and the google suite of products, even though at the time the PwC global network firms and many PwC clients including the Federal government would not allow the use of google mail or any cloud-based applications.

238.   This meant that PwC employees that had global clients or worked with global PwC network firms, which is most of Advisory, had to deal with two email systems and accounts, as well as Microsoft office and the google equivalent of those applications.  If one did not readily embrace google and use it at every opportunity, one was considered a dinosaur even though the google products were inferior.  For those who doing a lot of email internationally, it simply was not practical to try to deal with two separate email accounts.

239.    Employees were also urged to open Twitter accounts, and if one was not constantly tweeting, there was criticism. In spite of this, Galli did not complain and continued to live in New York and traveled for the firm wherever and whenever she was asked to go, including internationally.

240.   After leaving the firm, in September 2017, Galli encountered two of her former PwC partner colleagues at an industry conference and was put in the uncomfortable position of having two of the young male partners, referred to earlier, sit down and join her and several potential clients for drinks. These partners both formerly of the "technology unit", were two of the principals who were engaged on the last major

47

engagement Galli worked on in Washington, D.C. These young male partners were also two of the individuals who wanted Galli not to bill her time.

241.    During conversation, one of the PwC's partner stated that PwC partners have to retire at the age of 60.  When questioned about the reason, the partner admitted "it's because we need to make room for the young and hungry ones." He said this right in front of Galli, and once again it made Galli feel like the comment was made intentionally as a dig to her about her age and raised a red flag as to the reason behind her termination

242.    Since leaving PwC, Galli learned that PwC had terminated a series of other Directors and MDs, all in the protected age group.  For example:

      a.    Another MD from the Models and Analytics practice was terminated in July 2017 at the age of 63, and he was not given any apparent reason;

      b.    Two other female Directors who were terminated from the RAS practice in February 2017, both estimated to be in their 50s, and

      c.    Two male Directors from RAS who were terminated in July 2017 and July 2018 respectively, one in his fifties and the other 61 and a half. In the case of the Director terminated in 2018, he was originally told that he had to retire by the end of the calendar year. When the male Director questioned Stahlmann about the reason, she indicated that partners have to retire at age 60.  When said employee started asking questions about the terms of his "retirement" and what kind of benefits he could expect, he was told that Friday of that week would be his last day.

243.    There is clear evidence of an ongoing pattern of discrimination and the foregoing acts against Galli were intentional, egregious and oppressive, some included acts in violation of duties owed to her independent of her contractual relationship-duties owed by one human being to another.

## COUNT I

**For a Declaratory Judgment**
**Reforming Provisions of the EA and Voiding the AA in its entirety**
(Against PwC and PwC Advisory)

244.     Plaintiff repeats and realleges paragraph 1 through paragraph 243 as if fully set forth herein.

245.     Plaintiff seeks a declaratory judgment because there exists an actual and present controversy of a justiciable nature between Plaintiff and Defendants, including PwC, regarding the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought under the EA and AA.

246.     The Federal Arbitration Act, 9 U.S.C. §2, validates the arbitration process in interstate commerce, but provides an exception under certain circumstances, applicable to this dispute.  It provides that an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract."

247.     Under these circumstances, the declaratory judgment claim is properly before the court and is consistent with the AA, incorporated in and attached to the EA, and which provides in pertinent part:

> "The Arbitrator shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction."

248.    As alleged in this Amended Complaint, particularly at ¶¶ 41-87 the EA and the AA were the result of and procured by Defendants' through the fraudulent inducement of Plaintiff, as well as conduct and common law fraud and deceit, and are instruments that are unconscionable and in and violation of public policy.

249.    The EA and AA were instrumentalities of a well-designed continuous pattern of common law fraud which enabled PwC and PwC Advisory to commit with impunity fraud and other tortious conduct against Plaintiff and other employees, and to disregard the common rights of others to freedom from oppression and fraud.

250.    Linked with an ERISA plan which gives PwC absolute discretion as to employment matters, they are designed to frustrate and intimidate employees and their ability to seek judicial redress for wrongs committed against them, exposing them to multiple venues for the resolution of disputes

251.    In this case, as alleged, Galli was fraudulently induced to enter into agreement with PwC and these instruments were represented to be routine but necessary conditions of employment.

252.    In Galli's case the EA and AA operated in tandem with the Severance Plan incorporated by reference allows PwC to ignore statutory and common law with impunity.

253.    The EA and AA also contain provisions which are unconscionable and violative of public policy, not having been negotiated in good faith, lacking in an arms-

length negotiation and heavily weighted against Galli and others for an improper purpose, to commit wrongdoings against her and stifle competition, prohibited by public policy.

254.    Plaintiff asserts that because of the material misrepresentations and/or omissions by the named defendants stated in the Amended Complaint (collectively, "Defendants"), the EA is void in certain portions and the AA is entirely are void and of no force or effect and Plaintiff , therefore should not be bound to the terms of the referenced agreements.

255.    Defendants dispute these allegations and contend that the EA and AA have been in full force or effect since their commencement.

256.    A declaration is necessary and appropriate at this time so that the EA and AA are deemed void and unenforceable as a result of, among other things, the various wrongful conduct, fraud and misrepresentations of Defendants as identified herein.

257.    By engaging in the conduct as described above and herein, Defendants have acted in derogation of Plaintiff's rights.

258.    There is substantial evidence in the record of the numerous instances of Defendants' improper course of conduct over the more than two and half years with PwC, as noted below, for example, and not by limitation.

259.    Defendants fraudulently induced Galli to leave her employment at a large bank and to sign the EA and AA.

260.   During Defendants' recruitment of Galli, Defendants never disclosed to Galli the pending DFS investigation, the imminent sanctions, and how such sanctions would limit her in the new position at PwC.

261.   PwC failed to supply Galli with the requisite plan and/or summary plan description only until well after she had been terminated.

262.   Defendants defrauded and committed other tortious acts against Galli after she commenced working at PwC.

263.   Lavine lied to Galli after she joined PwC when she confronted him about not disclosing PwC's fraudulent and dishonest acts and the sanctions imposed upon it by the DFS.

264.   PwC failed to disclose to her that she was on a list submitted to the DFS which barred her from working on new business and from getting CSI information which is vital to her professional work at DFS.

265.   Lavine lied to her about PwC not being able to transfer her to another division.

266.   PwC failed to consider her for a merit increase which defrauded her from higher income.

267.   PwC and Lavine lied to her about her role at PwC – she was an MD in name only.

268.    PwC marginalized/subjugated Plaintiff for the benefit of younger males.

269.    PwC removed Galli from jobs in favor of younger men and did not give her credit for her work as she had been promised.

270.    PwC failed to disclose to her that she was being transferred to another unit which had been formed in order to circumvent certain regulatory sanctions and which was also not disclosed or discussed with DFS.

271.    PwC gave her a forced ranking as an employee so as to disqualify her for any bonus and make her susceptible to dismissal for cause.

272.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

273.    By reason of the foregoing, Plaintiff seeks a declaratory judgment voiding the AA in its entirety and voiding certain improper and unconscionable provisions of the EA alleged herein.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief (a) declaring that certain provisions of the EA, notably the restrictive covenants which are overly broad and unenforceable; (b) That the  AA is void and unenforceable; and (c) for such other relief which the Court may direct, together with attorneys' fees and costs.

## COUNT II

### Fraudulent Concealment/Inducement
### (Against All Defendants Except PwC Advisory and Calabrese)

274.    Plaintiff repeats and realleges paragraph 1 through paragraph 273 as if fully set forth herein.

275.    At all relevant times, defendants PwC, Lavine, Stahlmann and Riporti were employees, agents, servants and/or officers of PwC.

276.    As pleaded above, defendants, among other things, intentionally concealed material facts which should have been disclosed to Galli and misrepresented material facts with knowledge of their falsity which Galli relied upon to her detriment and damage.

277.    Defendants also intended to induce Plaintiff to enter into the EA and AA knowing that they were part of a fraudulent scheme used against employees to marginalize and manipulate them to PwC's advantage.

278.    Plaintiff reasonably relied upon the representations of Defendants.

279.    Defendants' actions were intentional, malicious and outrageous, violative of the independent legal duties which were due to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

280.   Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will.

281.   As a result of Defendants' material omissions, fraud and misrepresentations, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to lost wages; lost benefits; future pecuniary losses; special damages, such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, loss of quality of life; and other non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment on this Count for compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, together with attorneys' fees and costs.

## COUNT III

### Breach of Fiduciary Duty
### (PwC, Lavine, Stahlmann)

282.    Plaintiff repeats and realleges paragraph 1 through paragraph 281 as if fully set forth herein.

283.    At all relevant times, there existed a certain special and fiduciary duty between Plaintiff, as a non-equity partner and MD, hired to be a co-leader PwC's RAS unit.

284.    PwC, Lavine and Stahlmann for PwC, Lavine and Stahlmann to make disclosures and not to make misrepresentations of material facts to Galli so that she could prepare and perform her duties on behalf of the PwC partnership and for her own professional benefit, PwC having hired her for her unique skills in banking and AML compliance, and be informed to best represent PwC at industry functions and to heighten PwC's industry visibility, which Lavine represented to her was lacking.

285.    This fiduciary duty sprung from the fact that once Plaintiff accepted the employment on or before June 10, 2014, whether oral or written, she became a Managing Director, transitioning to being on-boarded at PwC in August 2014, the highest level executive short of a partner or a principal (a partner *sans* a CPA) and a non-equity partner of the firm who was to be, with Lavine and Stahlmann, a co-leader of the RAS Advisory Unit of PwC.

286.    The relationship among Galli and referenced defendants reposed a special trust and confidence such that it gave rise to a special relationship between the parties.

287.    The aforesaid defendants by reason of the foregoing conduct defendants breached their fiduciary duties of loyalty, honesty and disclosure owed to Plaintiff.

288.    As a result of Defendants' conduct, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief: compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish, together with attorneys' fees and costs

## COUNT IV

### Fraud and Tortious Acts Arising From Duties
### Separate Or Independent From Contract
(Against All Defendants)

289.     Plaintiff repeats and realleges paragraph 1 through paragraph 288 as if fully set forth herein.

290.     As stated herein, PwC's partners and the defendants failed in their duty to give Galli the decency and respect one human being owes to another, a duty independent of any contractual or business relationship, which arose out of the trust and confidence inherent in the nature of the contract itself, but from extraneous circumstances of the legal duty due from every man to his fellow, to respect the rights of property and the person of Galli (and others) and refrain from invading them by force or fraud, the violation of which caused damage to Galli and her property.

291.     Galli had developed a trust relationship with PwC, Lavine, and Stahlmann even before she had become an employee, but from her experience in becoming and serving as an MD, such trust she learned that  PwC had in place a nearly fool-proof corrupt business model at PwC which Galli never expected to confront from a renowned, respected and supposedly trustworthy CPA firm.

292.     Defendants'     actions     were     intentionally,     maliciously     and outrageously fraudulent, violative of the legal duties, over and above and extraneous from those imposed by contract, i.e., duties owed to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

293.    Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will.

294.    As a result of Defendants' conduct, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to lost wages; lost benefits; future pecuniary losses; special damages, such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, loss of quality of life; and other non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment on this Count for compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, together with attorneys' fees and costs.

## COUNT V

### Common Law Fraud
### (Against All Defendants)

295.    Plaintiff repeats and realleges paragraph 1 through paragraph 294 as if fully set forth herein.

296.    The foregoing acts set above involved misrepresentations or omissions of material facts relied upon by Galli.

297.    In addition, Defendants intentionally and knowingly made certain material misrepresentations and intentionally omitted to disclose material facts to Plaintiff which Defendants had an underlying duty to disclose.

298.    These material misrepresentations and/or omissions included, but were not limited to, the following:

  a.  Lavine lied to Galli after she joined PwC when she confronted him about not disclosing PwC's fraudulent and dishonest acts and the sanctions imposed upon it by the DFS.

  b.  PwC failed to disclose to her that she was on a list submitted to the DFS which barred her from working on new business and from getting CSI information which is vital to her professional work at DFS.

  c.  Lavine lied to her about PwC not being able to transfer her to another division.

  d.  PwC lied when she was told that she was eligible for a merit increase in July 2015 which defrauded her from higher income.

  e.  PwC and Lavine lied to her about her role at PwC – she was an MD in name only.

f.   PwC marginalized/subjugated Plaintiff for the benefit of younger males.

g.   PwC removed Galli from jobs in favor of younger men and did not give her credit for her work as she had been promised.

h.   PwC failed to disclose to her that she was being transferred to another unit which had been formed in order to circumvent certain regulatory sanctions and which was also not disclosed or discussed with DFS.

299.   These material misrepresentations of fact and/or omissions were made by Defendants to Plaintiff with Defendants' knowledge of their falsity.

300.   Defendants' actions were intentional and designed to defraud Plaintiff.

301.   Plaintiff reasonably relied upon the material misrepresentations and/or omissions of key facts by Defendants.

302.   Defendants' actions were malicious and outrageous, violative of the independent legal duties which were due to Galli as a human being, for her to be free from oppression and fraud and for Defendants to respect her rights of property and person, and refrain from invading them by force or fraud or other tortious acts.

303.   Defendants acts were calculated to harm Plaintiff in her person and her profession, to manipulate her and marginalize or subjugate her to less than an employee at will. As a result of Defendants' conduct, Plaintiff has suffered damages and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

304.   As a result of Defendants' material omissions, fraud and misrepresentations, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to lost wages; lost benefits; future pecuniary losses; special damages, such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, loss of quality of life; and other non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment on this Count for compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide together with attorneys' fees and costs.

## COUNT VI

### Breach of Contract
### (Against PwC and PwC Advisory)

305.   Plaintiff repeats and realleges paragraph 1 through paragraph 304 as if fully set forth herein.

306.   On June 11, 2014, Plaintiff and Defendant PwC entered into certain agreements, express and implied including those set forth in the EA Should the Count find that the EA is enforceable, Defendants PwC and PwC Advisory are in breach of their agreements with the Plaintiff.

307.    PwC advisory assumed the obligations of PwC in or about July 2015.

308.    Plaintiff has adequately performed her duties and obligations under the employment agreement.

309.    Under the terms of the EA, said defendants had an obligation to honor the special terms and conditions agreed to by Lavine that Galli would be eligible for a merit increase for the FY 2015, and honor the agreement that she would not be held to individual sales goals, and that she would be acting as an MD, the equivalent of a non-equity partner, among other things noted above.

310.    Based upon the course of conduct of Defendants identified in the Amended Complaint, Defendants have acted in bad faith and in contravention of the provisions of the EA and breached the agreement by, among other things, reneging on Plaintiff's eligibility for a merit increase, contrary to the terms of the EA and her performance rating in FY 2015; and imposing unwritten preconditions into EA related to her separation from PwC.

311.    As a direct and proximate cause of Defendants' breach of the aforementioned agreements, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses.

312.    As a result of Defendants' conduct, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses, including attorneys' fees.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief: compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; attorneys' fees and costs.

## COUNT VII

### Tortious Interference with Contract

**(PwC Advisory, Riporti, Calabrese and any non-parties
John or Jane Doe Defendants)**

313.     Plaintiff repeats and realleges paragraph 1 through paragraph 312 as if fully set forth herein.

314.     Plaintiff entered into a valid and enforceable contract with PwC.

315.     PwC Advisory, Lavine, Stahlmann, Riporti, Calabrese, and unknown third-party John Doe and Jane Doe defendants were not parties to but had knowledge of that valid and enforceable contract.

316.     Said defendants through their continuous actions set forth above intentionally and fraudulently and deceitfully procured a breach of the valid and enforceable contract and termination from employment on April 7, 2017by PwC.

317.     As a result of Defendants' material omissions, fraud and misrepresentations, Plaintiff has been damaged as she has suffered and will suffer harm including, but not limited to lost wages; lost benefits; future pecuniary losses; special damages, such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, loss of quality of life; and other non-pecuniary losses.

64

WHEREFORE, Plaintiff demands judgment on this Count for compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, together with attorneys' fees and costs.

## COUNT VIII

### (Promissory Estoppel)

318.    Plaintiff repeats and realleges paragraph 1 through paragraph 317 as if fully set forth herein.

319.    On or about August 18, 2014, after Galli learned that PwC had been sanctioned by the DFS and was concerned about the damages that she would incur as a result of the her name being submitted to the DFS as a person subject to the sanctions imposed by the DFS, she asked to be transferred by Lavine because her ability to perform under the contract of employment would be frustrated and adversely impact her ability to perform and her profession.

320.    Lavine promised Plaintiff and others that there were more than enough projects to keep her and others busy for the two-year period of sanctions.

321.    Lavine's promise was sufficiently clear and unambiguous.

322.    Galli reasonably relied on Lavine's promise and continued to perform her duties and responsibilities under the contract.

323.    Beginning in or about FY 2016 and continuing in FY 2017, PwC reneged on Lavine's promise and removed her from several projects to which she was eminently qualified, and giving the projects to younger and less qualified males, some of whom had just joined the firm.

324.    By reason of this and other conduct, she sustained damages and was ultimately terminated.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief: compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; attorneys' fees and costs, and such further legal and equitable relief and the court or a jury may provide;

## COUNT IX

### Age Discrimination Under the ADEA

325.    Plaintiff repeats and realleges paragraph 1 through paragraph 324 as if fully set forth herein.

326.    Plaintiff is a female citizen who is over the age of 40, a protected category.

327.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

328.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, in a series of unlawful adverse acts, practices, policies and procedures that discriminated against Galli with respect to her compensation, terms, conditions, and privileges of employment, because of Plaintiff's age in violation of the prohibitions in the Age Discrimination in Employment Act.

329.    PwC voluntarily and unlawfully discriminated against in the terms and conditions of her employment by, among other things as set forth in the Amended Complaint, particularly in ¶¶128-24, in which age was the determining factors in Defendants' discriminatory acts in  by failing to provide her merit raises and bonuses,  by falsifying her annual evaluation reports, failing to promote her, by depriving her of work and removing her from work and projects in favor of younger, less qualified males, and on April 7, 2017 by terminating Plaintiff from her position at PwC, all of these because of age.

330.    Plaintiff was most qualified and  age was the determining factor for such conduct.

331.    These practices were directed at Plaintiff and also were part of a systemic and concerted conduct engaged in by PwC.

332.    In both purpose and effect, however, the conduct identified herein and PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of age discrimination.

333.   PwC's discriminatory activities identified herein and set forth below include, but are not limited to, the following:  establishing, implementing and maintaining policies and practices that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their age, including Plaintiff; which operate to deprive qualified employees, including Plaintiff, because of their age, of the same wages, working conditions, job security, raises and promotional opportunities that are available to younger employees; and which operate to demote, reassign and downgrade qualified employees, including Plaintiff, because of their age; and utilizing subjective, non-job related criteria that, in purpose and effect, adversely affect the employment status of persons over a certain age, including Plaintiff.

334.   The aforesaid practices, policies, and procedures in a way that has produced both a disparate adverse treatment of Galli and disparate adverse impact on her as a person in the protected category.

335.   These practices as identified in the within complaint are still part of a systemic and concerted course of conduct engage in by PwC.

336.   As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from the PwC's job ranks a substantial number of employees over the age of 60, including the Plaintiff.

337.   Defendants, including PwC, have willfully discriminated against Plaintiff, by the conduct identified herein, and thereafter, by discharging her on or about April 7, 2017, solely because of her age.

338.    By the acts and practices described above, and in the alternative, Defendants willfully discriminated against plaintiff in the terms and conditions of her employment on the basis of her age in violation of the ADEA.

339.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiffs statutorily protected rights.  These violations were willful within the meaning of the ADEA.

340.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury in the form of back pay and front pay and other monetary damages as a result of defendants' discriminatory practices unless and until this Court grants relief and makes her whole.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief:  back pay; front pay; injunctive relief; equitable relief; liquidated damages as provided by the statute, for willful acts of discrimination, together with attorneys' fees and costs.

## COUNT X

### Age Discrimination Based on New York State Executive Law § 296
**(Against PwC, PwC Advisory, Lavine and other parties unknown)**

341.    Plaintiff repeats and realleges paragraph 1 through paragraph 340 as if fully set forth herein.

342.    Plaintiff is a female citizen who is over the age of 60.

343.   From 2014 to April 2017, Plaintiff lived and worked at PwC in New York City.

344.   Plaintiff was formerly employed by PwC and involuntarily terminated on April 7, 2017.

345.   At all relevant times, PwC had, and still has, more than four employees.

346.   Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, in a series of unlawful adverse acts, practices, policies and procedures that discriminated against Galli with respect to her compensation, terms, conditions, and privileges of employment, because of Plaintiff's age, in violation of the prohibitions in the NYS Executive Law § 296(1)(a).

347.   PwC voluntarily and unlawfully discriminated against in the terms and conditions of her employment by, among other things as set forth in the Amended Complaint, particularly in ¶¶128-24, in which age was the determining factors in Defendants' discriminatory acts in by failing to provide her merit raises and bonuses, by falsifying her annual evaluation reports, failing to promote her, by depriving her of work and removing her from work and projects in favor of younger, less qualified males, and on April 7, 2017 by terminating Plaintiff from her position at PwC, all of these because of age.

348.   Plaintiff was most qualified and age was the determining factor for such conduct.

349.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

350.    The actions by Defendants were extreme and outrageous and beyond the bounds of decency tolerated in this society.

351.    The actions of Defendants were intentionally designed to cause Plaintiff severe emotional distress or were taken with reckless disregard of the significant probability of causing Plaintiff severe emotional distress.

352.    The actions of Defendants caused Plaintiff to suffer and she has been continuing to suffer severe emotional distress including anxiety, depression and loss of sleep as a result of the actions and/or omissions of Defendants.

353.    As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief:  back pay; front pay; injunctive relief; equitable relief; liquidate damages as provided by the statute for willful acts of discrimination, together with attorneys' fees and costs.

## COUNT XI

### Age Discrimination Under Article 8 of New York City Administrative Code
### (Against PwC, PwC Advisory, Lavine and other parties unknown)

354.     Plaintiff repeats and realleges paragraphs 1 through paragraph 353 as if fully set forth herein.

355.     Plaintiff is a female citizen who is over the age of 60, a protected category.

356.     From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

357.     Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Age Discrimination under Article 8 of New York City Administrative Code, including but not limited, such acts identified under § 8-107.

358.     PwC involuntarily unlawfully discriminated against in the terms and conditions of her employment by, among other things as set forth above, failing to provide merit raises, by falsifying her annual evaluation reports, failing to promote her, by depriving her of work and removing her from work and projects in favor of younger males, and on April 7, 2017 terminated Plaintiff from her position at PwC, all of these because of age.

359.     At all relevant times, the PwC had, and still has, more than four employees.

360.    These practices were, and still are, part of a systemic and concerted conduct engaged in by PwC.

361.    As promulgated, such conduct was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

362.    In both purpose and effect, however, the conduct identified herein and PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of age discrimination.

363.    PwC's discriminatory activities identified herein and set forth below include, but are not limited to, the following:  establishing, implementing and maintaining policies and practices that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their age, including Plaintiff; which operate to deprive qualified employees, including Plaintiff, because of their age, of the same wages, working conditions, job security, raises and promotional opportunities that are available to younger employees; and which operate to demote, reassign and downgrade qualified employees, including Plaintiff, because of their age; and utilizing subjective, non-job related criteria that, in purpose and effect, adversely affect the employment status of persons over a certain age, including Plaintiff.

364.    The aforementioned conduct had an impact within New York City.

365.    In particular, Defendants have established, implemented and maintained its practices, policies, and procedures in a way that has produced both a

disparate adverse treatment of, and disparate adverse impact on, older employees, including Plaintiff.

366.    These practices as identified in the within complaint are still part of a systemic and concerted course of conduct engage in by PwC.

367.    As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from the PwC's job ranks a substantial number of employees over the age of 60, including the Plaintiff.

368.    Defendants, including PwC, have willfully discriminated against Plaintiff, by the conduct identified herein, and thereafter, by discharging her on or about April 7, 2017, solely because of her age.

369.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief: compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, lost earnings, lost benefits, and other severe financial losses as well as humiliation,

embarrassment, emotional and physical distress and mental anguish, together with attorneys' fees and costs.

## COUNT XII

### Violation of Title VII of the Civil Rights Act of 1964, as Amended-Gender Discrimination in Terms and Conditions of Employment 42 U.S.C. § 2000e et seq.

### (Against PwC, PwC Advisory, and Lavine, Stahlmann)

370.    Plaintiff repeats and realleges paragraph 1 through paragraph 369 as if fully set forth herein.

371.    Plaintiff is a female who was formerly employed by PwC and involuntarily terminated on April 7, 2017.

372.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

373.    At all relevant times, PwC had, and still has, more than four employees.

374.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Gender Discrimination under Title VII.

375.    These practices were, and still are, part of a systemic and concerted course of conduct engaged in by PwC.

376.    As promulgated, such plan was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

377.    In both purpose and effect, however, PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of gender discrimination.

378.    PwC's discriminatory activities identified herein and set forth below include, but are not limited to, the establishing, implementing and maintaining policies and practices: that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their gender, including Plaintiff; which operate to deprive qualified female employees, including Plaintiff, because of their gender, of the same wages, working conditions, job security, raises and promotional opportunities that are available to employees who are male; which operated to demote, reassign and downgrade qualified female employees, including Plaintiff, because of their gender; and, which utilizing subjective, non-job-related criteria that, in purpose and effect, adversely affect the employment status of female employees, including Plaintiff.

379.    In particular, Defendants have established, implemented and maintained its policies, practices and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, female employees, including Plaintiff.

380.    As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from PwC's job ranks a substantial number of female employees, especially Plaintiff.

381. Defendants have willfully discriminated against the Plaintiff, by the conduct identified herein and thereafter, by discharging her on or about April 7, 2017, solely because of her gender.

382. As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

383. The actions by Defendants were extreme and outrageous and beyond the bounds of decency tolerated in this society.

384. The actions of Defendants were intentionally designed to cause Plaintiff severe emotional distress or were taken with reckless disregard of the significant probability of causing Plaintiff severe emotional distress.

385. The actions of Defendants caused Plaintiff to suffer and she has been continuing to suffer severe emotional distress including anxiety, depression and loss of sleep as a result of the actions and/or omissions of Defendants.

386. As a result of Defendants' conduct, Plaintiff has suffered and will suffer harm including, but not limited to, lost earnings, lost benefits, and other severe financial losses as well as humiliation, embarrassment, emotional and physical distress.

387. Defendants have discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender.

388.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII.

389.    Defendants' differential treatment of Plaintiff is a direct and proximate result of gender discrimination.

390.    Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

391.    By reason of the continuous nature of Defendants' discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

392.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

393.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages,  punitive damages and other appropriate, together with attorneys' fees and costs.

## COUNT XII

### Gender Discrimination Based on New York State Executive Law § 296
**(Against PwC, PwC Advisory, Lavine, and other parties unknown)**

394.    Plaintiff repeats and realleges paragraph 1 through paragraph 393 as if fully set forth herein.

395.    Plaintiff is a female who was formerly employed by PwC and involuntarily terminated on April 7, 2017.

396.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

397.    At all relevant times, the PwC had, and still has, more than four employees.

398.    Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Gender Discrimination based on NYS Executive Law § 296.

399.    These practices were, and still are, part of a systemic and concerted course of conduct engaged in by PwC.

400.    As promulgated, such plan was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

401.    In both purpose and effect, however, PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of gender discrimination.

402.    PwC's discriminatory activities identified in the within complaint and set forth below include, but are not limited to, the establishing, implementing and maintaining policies and practices: that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified female employees because of their gender, including Plaintiff; which operate to deprive qualified female employees, including Plaintiff, because of their gender, of the same wages, working conditions, job security, raises and promotional opportunities that are available to female employees; which operate to demote, reassign and downgrade qualified female employees, including Plaintiff, because of their gender; and which utilize subjective, non-job-related criteria that, in purpose and effect, adversely affect the employment status of female employees, including Plaintiff.

403.    In particular, Defendants have established, implemented and maintained its policies, practices and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, female employees, including Plaintiff.

404.    As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from the defendant's job ranks a substantial number of female employees, including Plaintiff.

405.    Defendants, including PwC, have willfully discriminated against the Plaintiff, by the conduct identified herein, and thereafter, by discharging her on or about April 7, 2017, solely because of her gender.

406.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish' together with attorneys' fees and costs.

WHEREFORE, Plaintiff demands judgment on the Amended Complaint for the following relief:

## **COUNT XIII**

### **Gender Discrimination Under Article 8 of New York City Administrative Code**
**(Against PwC, PwC Advisory, Lavine and other parties unknown)**

407.    Plaintiff repeats and realleges paragraphs 1 through paragraph 406 as if fully set forth herein.

408.    Plaintiff is a female who was formerly employed by PwC and involuntarily terminated on April 7, 2017.

409.    From 2014 to April 2017, Plaintiff lived and worked for PwC in New York City.

410.    At all relevant times, PwC had, and still has, more than four employees.

411.   Commencing in 2015, and continuing without interruption to the present, Defendants have intentionally, willfully and maliciously engaged, and still engage, in a series of unlawful acts, practices, policies and procedures that violate Gender Discrimination under Article 8 of NYC Administrative Code.

412.   These practices were, and still are, part of a systemic and concerted course of conduct engaged in by PwC.

413.   As promulgated, such plan was ostensibly designed, among other things, to reduce personnel expenses by means of direct staff reductions.

414.   In both purpose and effect, however, PwC's related employee policies, practices and procedures, have reflected and still reflect a blatant, willful and malicious pattern of gender discrimination.

415.   PwC's discriminatory activities identified herein and set forth below include, but are not limited to, the establishing, implementing and maintaining policies and practices: that have been, and still are, unlawful and discriminatory in purpose and effect in terminating from employment qualified persons because of their gender, including Plaintiff; which operate to deprive qualified female employees, including Plaintiff, because of their gender, of the same wages, working conditions, job security, raises and promotional opportunities that are available to employees who are male; which operated to demote, reassign and downgrade qualified female employees, including Plaintiff, because of their gender; and, which utilizing subjective, non-job-related criteria that, in purpose and effect, adversely affect the employment status of female employees, including Plaintiff.

416.    In particular, Defendants have established, implemented and maintained its policies, practices and procedures in a way that has produced both a disparate adverse treatment of, and disparate adverse impact on, female employees, including Plaintiff.

417.    As a result, PwC's conduct has caused, directly and indirectly, the disproportionate elimination and downgrading from PwC's job ranks a substantial number of female employees, especially Plaintiff.

418.    Defendants have willfully discriminated against the Plaintiff, by the conduct identified herein and thereafter, by discharging her on or about April 7, 2017, solely because of her gender.

419.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

420.    The actions by Defendants were extreme and outrageous and beyond the bounds of decency tolerated in this society.

421.    The actions of Defendants were intentionally designed to cause Plaintiff severe emotional distress or were taken with reckless disregard of the significant probability of causing Plaintiff severe emotional distress.

422.   The actions of Defendants caused Plaintiff to suffer and she has been continuing to suffer severe emotional distress including anxiety, depression and loss of sleep as a result of the actions and/or omissions of Defendants.

423.   As a result of Defendants' conduct, Plaintiff has been damaged and she has suffered and will suffer harm including, but not limited to lost wages; lost benefits; future pecuniary losses; special damages, such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, loss of quality of life; and other non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment on this Count for compensatory damages, including lost wages; lost benefits; future pecuniary losses; special damages; such as humiliation, embarrassment, emotional and physical distress and mental anguish; emotional pain, suffering, inconvenience, mental anguish, loss of life, punitive damages; other non-pecuniary losses as the court or a jury may find and permit and such other relief which the Court or a jury may provide, together with attorneys' fees and costs.

## JURY DEMAND

Plaintiff hereby demands trial by Jury where permitted by law.


DATED:        April 2, 2020

                                    ZEICHNER ELLMAN & KRAUSE LLP
                                    Attorneys for Plaintiff Susan J. Galli


                                    /s/ William T. Marshall, Jr.
                                    William T. Marshall, Jr. Esq.
                                    1211 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 223-0400